UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOANNE J. BOUGALIS,                           CIVIL NO. 14-1382 (ADM/JSM)

Plaintiff,

v.                                            <u>REPORT AND RECOMMENDATION</u>

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

Defendant.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came before the undersigned United States Magistrate Judge upon the parties' cross-motions for summary judgment. [Docket Nos. 12 and 16].  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).  The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    PROCEDURAL BACKGROUND

Plaintiff Joanne Bougalis ("Bougalis") initially applied for disability insurance benefits ("DIB") on April 15, 2005.  (Tr. 137).  The Social Security Administration ("SSA") denied Bougalis's application on November 27, 2007.[1]  (Tr. 213-16).

On July 19, 2010, Bougalis reapplied for DIB.  (Tr. 137, 182).  She alleged a disability onset date of October 1, 2004 as a result of post-traumatic stress disorder ("PTSD"), chronic neck pain, bilateral knee pain, and PTSD headaches.  (Tr. 182).

---

[1]    As explained below, the record contains few details concerning Bougalis's initial application for disability benefits.  Most notably, all but four pages of the decision and findings of the prior ALJ are missing from the record.  (Tr. 213-16).

Bougalis later amended her alleged onset date to November 28, 2007. (Tr. 120, 138). Bougalis was last insured for disability benefits on December 31, 2009. (Tr. 137, 182, 290). The SSA denied Bougalis's application on January 13, 2011, and on reconsideration on March 10, 2011. (Tr. 181-96, 197-212).

Bougalis requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 230-31). A hearing was held on November 20, 2011, before ALJ Joan G. Knight. (Tr. 135-80). Bougalis was represented by Andrew Muirhead, Esq. (Id.). John Komar, a vocational expert ("VE"), testified at the hearing, as did Bougalis. (Id.).

On January 4, 2012, the ALJ issued her decision denying Bougalis's application for benefits. (Tr. 120-30). That same day, Bougalis filed a request for review of the ALJ's decision by the SSA Appeals Council. (Tr. 98). On July 27, 2013, the Appeals Counsel denied Bougalis's request for review, (Tr. 98-100), making the ALJ's decision final. See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

Bougalis sought review of the ALJ's decision by filing a Complaint in this Court, pursuant to 42 U.S.C. § 405(g). [Docket No. 1]. The parties have now filed cross-motions for summary judgment. [Docket Nos. 12, 16].

## II.   PROCESS FOR REVIEW

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-

step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.     The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

"When considering whether the ALJ properly denied social security benefits, [the court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir.2003), the use of erroneous legal standards, or an incorrect application of the law, Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir.1983)." Id.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465

F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (holding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). .

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.   DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step process.

At step one, the ALJ concluded that Bougalis had not engaged in substantial gainful activity from November 28, 2007, the alleged disability onset date, through

December 31, 2009, the date Bougalis was last insured under the Social Security Act.[2] (Tr. 122).

At step two, the ALJ found that Bougalis had the following severe impairments: neck pain, with reported cervical kyphosis; knee pain, with a need for orthotics; history of migraine headaches; depressive disorder with anxiety; and PTSD.  (Tr. 122-23).

At step three, the ALJ determined that Bougalis's symptoms did not meet or medically equal one of the presumptively disabling impairments listed under 20 C.F.R. Part 404, Subpt. P, App. 1.  As to Bougalis's physical symptoms, the ALJ considered the criteria for major dysfunction of a joint (Listing 1.02), disorder of the spine (Listing 1.04), and neurological impairments (Listing 11.00), and found that none of her physical impairments were consistent with the level of severity of a condition that meets the criteria under the Listings."  (Tr. 123).

With respect to mental impairments, the ALJ determined that Bougalis's symptoms did not meet or medically equal the criteria for affective disorders (Listing 12.04) and anxiety-related disorders (Listing 12.06).  (Tr. 123).  In particular, the ALJ found that the "paragraph B" criteria had not been satisfied as to Listings 12.04 and 12.06 because Bougalis's mental impairments did not result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace;

---

[2]     On the first page of her decision, the ALJ stated that Bougalis's date last insured was June 30, 2008.  (Tr. 120).  This was clearly a typographical error, as the ALJ correctly indicated later in the opinion that Bougalis was last insured on December 31, 2009.  (Tr. 122).  Further, the ALJ's discussion included evidence through and after the end of 2009.

or repeated episodes of decompensation, each of extended duration.  (Tr. 123-24); <u>see</u>

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

With respect to activities of daily living, the ALJ found that Bougalis had

moderate restriction.  (Tr. 123).  In making that determination, the ALJ noted:

- Bougalis reported caring for her children and mother afflicted with Alzheimer's disease and reported independence with her daily living activities;

- Bougalis's mental status examinations reflected appropriate presentation and self-care;

- Bougalis was capable of managing her household and family and frequently traveled between Minnesota and Arizona;

- Medical evidence of record indicated that Bougalis experienced anxiety in leaving the house for certain appointments.

(Tr. 123).

As to social functioning, the ALJ observed that, despite Bougalis's impairments,

she continued to drive, spend time with her family, and care for her children.  (Tr. 123-

24).  In addition, treatment notes showed that Bougalis actively participated in therapy

sessions and effectively engaged in writing and narrative exercises.  (Tr. 124).  For

those reasons, the ALJ concluded that Bougalis had moderate difficulties in the area of

social functioning.  (<u>Id.</u>).

With regard to concentration, persistence or pace, the ALJ indicated:

- Medical evidence indicated that Bougalis maintained the same level of moderate difficulty with concentration, persistence, or pace;

- Although Bougalis alleged trouble with memory, she reported writing, crafting, and emailing;

- Mental status examinations revealed no memory deficits;

- Bougalis's medication regimen was consistently maintained.

(Tr. 124). Based on these findings, the ALJ determined that Bougalis had moderate difficulty in the area of concentration, persistence or pace. (Id.).

As to episodes of decompensation, the ALJ indicated that the medical evidence of record showed no extended episodes of decompensation. (Id.).

Finally, the ALJ concluded that the "paragraph C" criteria had not been met because "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria."[3] (Id.).

At step four of the analysis, the ALJ determined that Bougalis had the following residual functional capacity ("RFC"):

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: the claimant is capable of

---

[3]    To satisfy the paragraph C criteria of Listing 12.04, the claimant must show:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.    Repeated episodes of decompensation, each of extended duration; or
>
> 2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id., § 12.04(C). To meet the paragraph C criteria of Listing 12.06, the claimant must provide evidence that the disorder resulted in a complete inability to function independently outside the area of the claimant's home. Id., § 12.06(C).

> unskilled work.  She is capable of brief, superficial contact with co-workers and supervisors; incidental public contact totaling no more than 1/6 of the workday; with no direct customer service; and no rapid or frequent changes in work routine.

(Id.).

After considering all of Bougalis's symptoms and the extent to which they could be reasonably accepted as consistent with the objective medical evidence, the ALJ concluded that Bougalis's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  (Tr. 125).  However, the ALJ did not credit Bougalis's testimony concerning the intensity, persistence, and limiting effects of her impairments to the extent they were inconsistent with the ALJ's RFC assessment.  (Id.). The ALJ explained that Bougalis's limitations were accounted for in the RFC assessment and were not severe enough to qualify for disability benefits.  (Id.).

In reaching this determination, the ALJ applied a presumption of continuing nondisability, as set forth in Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1988).  To overcome a presumption of continuing nondisability arising from a prior ALJ's denial of benefits, the Chavez presumption requires a disability claimant residing within the Ninth Circuit to demonstrate changed circumstances indicating a new or greater disability.  Id. at 693; see also Social Security Acquiescence Ruling 97-4(9) ("AR 97-4(9)"), available at  http://www.socialsecurity.gov/OP_Home/rulings/ar/09/AR97-04-ar-09.html  (applying Chavez to disability claimants residing within the Ninth Circuit at the time of disability determination).  The ALJ noted that Bougalis had alleged new diagnoses of hand pain, noncardiac chest pain related to anxiety, and worsened mental symptoms of depression and anxiety.  (Tr. 125).  However, the ALJ found that the evidence in support of these new symptoms was not material to the relevant period between Bougalis's alleged

disability onset date and the date last insured.  (Id.).  Therefore, the ALJ concluded that the <u>Chavez</u> presumption had not been rebutted, and Bougalis was not disabled.  (Tr. 120).

In support of this conclusion, with regard to hand pain, the ALJ determined that Bougalis's symptoms had been extensively documented and discussed in her prior application for benefits, and no other evidence prior to the date last insured corroborated Bougalis's allegations.  (Tr. 125).

As to claims of worsened mental impairments, the ALJ found that Bougalis's increased symptoms occurred when her father died in April, 2010, after the date last insured.  (Id., citing Tr. 1220, 1165).  Treatment notes from March, 2010, indicated that Bougalis was "'not describing any major depression.'"  (Tr. 125-26, quoting Tr. 622). Medical evidence in the record demonstrated that the Global Assessment of Functioning score ("GAF")[4] for Bougalis remained at 55 during this time.  (Tr. 125, 126). The only low GAF was from October, 2011, almost two years after Bougalis's date last insured.  (Tr. 126).

The ALJ further indicated that treatment notes prior to the date of last insured indicated that Bougalis's mental status was consistently temperate.  (Id.).  Mental

---

[4]     The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning."  <u>Hudson ex rel Jones v. Barnhart</u>, 345 F.3d 661, 663 n. 2 (8th Cir. 2003) (quoting <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. Text Revision 2000)).  GAF scores of 51–60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  <u>Id.</u> (citation omitted).  GAF scores of 41 to 50 reflect "'[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  <u>Id.</u> (alteration in original) (citation omitted).

examinations by treating therapists and psychologist repeatedly noted that Bougalis had good appearance; appropriate affect; normal alertness; moderate depressed mood; good cooperation; concrete, goal directed thought process; and pleasant and cooperative behavior. (Id.). Treatment records frequently noted Bougalis's good judgment, insight, concentration, and memory; unremarkable speech; and good eye contact. (Id., citing Tr. 470-887, 1209-35). Bougalis's treating practitioner, Jeannette Merrill, consistently evaluated her overall mental health as "'stable, with no major changes.'" (Id., citing Tr. 1209-35). Bougalis told her mental health provider that she was doing well. (Id., citing Tr. 1168).[5] Treatment notes from October, 2008, indicated that Bougalis's depression was well controlled. (Id., citing Tr. 719). Medical records from September, 2011, reported that Bougalis was feeling stable. (Id., citing Tr. 906). In August, 2011, Bougalis stated that her medications were helping. (Id., citing Tr. 916). Bougalis's treatment providers repeatedly assigned GAF scores of 80/90 (id., citing Tr. 906-970) and 55 (id., citing Tr. 906-970, 1209-35). Treatment notes also showed that Bougalis's medication regimen had been effective, without misuse or tolerance. (Id., citing Tr. 452, 1226).

Bougalis's physical examinations produced normal or unremarkable results, including good muscle strength, bulk and tone; normal gait; normal range of motion, flexion and extension; unremarkable sensory results; and normal deep tendon reflexes of her upper and lower extremities. (Tr. 126, citing Tr. 470-887, 906-1235, 1244). The ALJ also noted that MRI results of the knee from 2011 showed only mild abnormality,

---

[5]     The statement referenced by the ALJ actually appears at page 804 of the administrative record.

and, in any event, the results were too remote from the date last insured to attribute to the relevant period prior to the date last insured. (Tr. 125).

Echocardiogram results from 2009 were normal. (Tr. 126, citing Tr. 633, 643). Cardiology stress tests from 2010 revealed negative results. (Id., citing Tr. 621). A chest MRI from 2011 showed unremarkable and negative results. (Id., citing Tr. 989). MRI scans of the left and right foot from 2009 showed mild or stable-mild degenerative change. (Id., citing Tr. 488, 541). Cervical spine MRI results from 2007 were normal, (id., citing Tr. 497), and a thoracic spine MRI in 2008 showed stable mild degenerative change. (Id., citing Tr. 541). MRI scans of Bougalis's hand from July, 2008, were normal, and scans from November, 2009, showed essentially unchanged normal results. (Id., citing Tr. 486-87). Bilateral wrist and hand MRI results from March, 2011, were normal. (Id., citing 990-92). X-rays of the knee in January, 2011, revealed "'negative routine three views of each knee.'" (Id., citing Tr. 1002-04).

Bougalis reported that orthotics had effectively managed her pain and that she was pain free when wearing them. (Tr. 127, citing Tr. 1029). Medical records showed that Bougalis's physical therapy was effective and that her strength and endurance were slowly improving. (Id., citing Tr. 927). Treatment notes from October, 2007, reported that Bougalis saw improvement from chiropractic therapy and was "'expected to get 100% recovery with additional treatment.'" (Id., citing Tr. 579). Treatment notes from November, 2009, indicated that Bougalis "'is able to manage her knee and neck pain with Tylenol and ibuprofen as needed.'" (Id., citing Tr. 652). In October, 2009, Bougalis claimed that "'sometimes she does not need [the medication].'" (Id., citing Tr. 664 (alteration in original)). In December, 2009, treatment notes provided that Bougalis

"'den[ied] any side effects to her medications.'"   (Id., citing Tr. 642 (alteration in original)).  In February, 2010, treatment notes stated that Bougalis was doing well.  (Id., citing Tr. 621).  In March, 2010, Bougalis reported that "'her neck pain and knee pain are controlled on the current regimen.'"   (Id., citing Tr. 612).  Bougalis's chiropractor observed marked improvement.  (Id., citing Tr. 589).

In April, 2008, treatment notes indicated that Bougalis had reported mild aching in her fingers and "'notices it mostly when she is typing,'" (id., citing Tr. 738), which, according to the ALJ, "indicat[ed] a greater physicality than alleged by [Bougalis]."  (Id.).  Bougalis's treating physician stated that she "'may want to limit her computer work until this is better.'"  (Id.).[6]  Physical examinations revealed no swelling or erythema[7] and no sign of inflammation.  (Id., citing Tr. 738, 740).  Treatment notes from November, 2009, reported good grip strength and minimal tenderness with no synovial[8] thickening or active synovitis.  (Id., citing Tr. 654).

In March, 2010, after the date last insured, treatment notes indicated that Bougalis felt her heart was fine and that the pain in her chest corresponded to times of stress.  (Id., citing Tr. 612).  Bougalis's treating physician, Dr. Amida Gallito, suggested that she continue to observe the symptoms.  (Id., citing Tr. 612).

---

[6]   The ALJ cited to "Exhibit 15F, p. 93".  The Court was unable to locate this exhibit in the administrative record.  However, the report cited by the ALJ is found on page 800 of the record.

[7]   Erythema is a "[r]edness due to capillary dilation."  Stedman's Medical Dictionary 615 (27th ed. 2000) ("Stedman's").

[8]   The synovial membrane is "[a] layer of connective tissue that lines the cavities of joints, tendon sheaths, and bursae (fluid-filled sacs between tendons and bones).  The synovial membrane makes synovial fluid, which has a lubricating function." U.S. National Library of Medicine, Synovial Membrane, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022821/ (last visited March 23, 2015).

The ALJ further noted that Bougalis had consistently traveled back and forth to Minnesota to care for her mother, which indicated greater physical capability than alleged by Bougalis.  (Id.).

The ALJ afforded little weight to the opinion of Jeannette Merrill, MA, RN.  On June 20, 2007, Merrill gave Bougalis a "guarded" prognosis, assigned her a GAF score of 52, and concluded that Bougalis could not meet competitive standards of most job-related mental functions and was therefore extremely limited in her functional areas. (Id., citing Tr. 464-69).  The ALJ did not credit Merrill's testimony because it was not supported by medical evidence of record.  (Id.).  In particular, the ALJ noted:

- Bougalis's mental status examinations had largely been within normal limits and her symptoms were managed by medications throughout the relevant time period;

- Merrill's opinion that Bougalis could not sustain full-time employment was inconsistent with Bougalis's assigned GAF score of 52, which indicated moderate symptoms;

- Merrill treated Bougalis every six months for 30 minutes, which was "infrequent, cursory treatment and serves to undermine the credibility" of Merrill's opinion;

- Merrill's opinion was rendered prior to Bougalis's alleged disability onset date and, therefore, did not bear on the relevant time period; and

- A nurse practitioner is not an acceptable medical source for purposes of Social Security disability evaluation.

(Tr. 127-28).

The ALJ also gave little weight to the testimony of Cindy Macaulay, M.Ed., who had treated Bougalis between 2007 and 2009.  (Tr. 128).  With respect to Bougalis's mental condition, on November 18, 2011, Macaulay stated:

[M]y records indicate six visits during that time period – two at the Vet Center and four phone visits.  I recall clearly during that time that you were very home-bound and had an extremely hard time being away from the comfort and security of your home and amongst other people, which is why we only got together when you had appointments forced on you (to renew your prescriptions) by the Twin Ports Outpatient Clinic.  This is in comparison to the years before when we met and/or spoke by phone quite frequently.  I would definitely say your PTSD and social anxiety got much worse during that time, making work impossible . . . .

(Id., citing Tr. 337-38).   The ALJ did not credit Macaulay's opinion for the following reasons:

- Macaulay's opinion was not supported by the totality of the medical evidence of record;

- Macaulay treated Bougalis only six times in three years, which indicated less than severe symptoms;

- Treatment sessions were conducted via telephone, and, therefore, Bougalis's alleged anxiety in leaving her home did not account for the infrequent treatment sessions;

- Bougalis received sustained GAF scores of 55, indicating "moderate" symptoms;

- Bougalis's mental status examinations were consistently within normal limits;

- Treatment records indicated that Bougalis's depression was "well controlled" and "stable" during the relevant time period;

- Bougalis's worsening symptoms were documented after the date last insured;

- Macaulay's opinion relied heavily on Bougalis's subjective reports of symptoms and limitations, which were not supported by the totality of the evidence;

- Macaulay's opinion did not show "the type of significant clinical and laboratory abnormalities to be expected if the individual were disabled;"

15

- A therapist is not an acceptable medical source for purposes of evaluating Social Security disability claims.

(Id.).

Finally, the ALJ gave little weight to the opinion of Bougalis's son because it was inconsistent with the medical evidence of record, it was likely biased given his close relationship with Bougalis, and, even if fully credible, it did not persuade the ALJ that Bougalis was incapable of sustained gainful employment.  (Id.).

In sum, the ALJ concluded that the RFC determination was supported by medical evidence of record, and by Bougalis's own statements in her application for benefits and to medical providers.  (Id.).  The ALJ found no medical evidence that contradicted the RFC assessment or indicated additional restrictions beyond the RFC, except for the opinions of Merrill and Macaulay, which the ALJ afforded little weight.  (Tr. 128-29).

At the fourth step of the analysis, the ALJ determined that Bougalis could not perform any past relevant work as a secretary or director of youth services because those positions required nonexertional demands in excess of Bougalis's RFC.  (Tr. 129).

At the fifth step, the ALJ relied on the VE's expert testimony that a person of Bougalis's age, education, work experience and RFC could perform the requirements of representative unskilled occupations such as housekeeping cleaner, courier, and small product assembler.  (Tr. 129-30).  The ALJ determined that such occupations existed in significant numbers in the national economy and that the VE's testimony was consistent with information contained in the Dictionary of Occupational Titles.  (Tr. 130).

## IV.   THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

Bougalis challenged the ALJ's decision on the following grounds: First, the ALJ erred in applying the Chavez presumption and AR 97-4(9) because the record was not

fully developed as to whether Bougalis resided in Arizona.  Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem."), pp. 26-29 [Docket No. 13]. Second, even if the Chavez presumption applied and required adopting the prior ALJ's findings, there is no way for this Court to do so because the prior ALJ's decision and analysis are missing from the record.  Id., p. 29.  Third, the record contained sufficient evidence of new impairments, including impairments to her hand and chest pain, along with worsened mental impairments, to rebut the presumption of continuing nondisability. Id., pp. 30-31.  For example, non-examining treating agency reviewers found limitations not considered by the prior ALJ, and determined that she must avoid concentrated exposure to hazards (machinery, heights, etc.) and is limited to simple one to two-step instructions. Id., p. 30 (citing Tr. 191-92, 208, 209).  Likewise, Merrill and Macaulay provided evidence describing limitations that exceeded those given by the prior ALJ, as did the VA's finding of ongoing 100% disability for PTSD rendering her totally and permanently disabled.  Id., (citing Tr. 23-27, 87, 350).

Fourth, the ALJ failed to evaluate the opinions of treating mental health professionals Merrill and Macaulay in the manner required by law, and failed to give good reasons for affording their opinions little weight. Id., pp. 31-37.

Fifth, the hypothetical question posed to the VE was inadequate for judicial review because the record did not contain the specific hypothetical question answered by the VE, and the hypothetical question did not include the limitations of moderate impairment of concentration, persistence or pace found by the ALJ.  Id., pp. 37-39 (citing Tr. 124).  Further, the hypothetical failed to include or evaluate the weight of the opinions of the State Agency consultants who placed environmental limitations on

Bougalis including that she should avoid concentrated exposure to hazards; limitations on her ability to understand and carry out detailed instructions, to perform activities within a schedule, to maintain attendance and be punctual, to complete the workday without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; and that she was limited to "simple (one to two step) instructions." (Id., pp. 38-39) (citing Tr. 191-92, 198, 208-09.

Sixth, the ALJ failed to properly consider the Veteran's Administration's ("VA") 100% disability rating and the evidence upon which it was based. Id., pp. 39-40. Finally, the ALJ failed to consider the effect that Bougalis's PTSD and fibromyalgia had on her physical symptoms and perception of pain, and whether it helped to explain the symptoms she was having before the date last insured. Id., pp. 40-41.

The Commissioner argued that the ALJ properly applied Chavez and AR 97-4(9) because the record showed that Bougalis was a resident of Arizona, and the new evidence submitted by Bougalis did not relate to the relevant period prior to December 31, 2009. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), pp. 6-8 [Docket No. 17]. As to Bougalis's argument that the ALJ erred in applying AR 97-4(9) because the previous ALJ decision was not in the current record, the Commissioner contended that Bougalis failed to show prejudice, as Bougalis's attorney read the prior RFC into the record at the hearing, and the reviewing consultants discussed the prior RFC in their opinions. Id., p. 8 (citing Tr. 184, 201). In any event, the Commissioner argued, the ALJ did not apply AR 97-4(9); rather, she reviewed the entire record and formulated her own RFC. Id., pp. 8-9. The Commissioner also

maintained that the ALJ properly discredited the opinions of Macaulay and Merrill because they were unsupported, contradictory, and were not acceptable medical sources. Id., pp. 10-17.

The Commissioner disagreed with Bougalis's assertion that the ALJ's hypothetical question to the VE should have included additional limitations, including those provided by the State Agency consultants. Id. 20-21.  The Commissioner claimed that Bougalis selectively quoted from the reviewing physicians' opinions and ignored their statements adopting the prior ALJ's decision because there had not been a change in circumstances.  Id., p. 21 (citing Tr. 186, 203, 207, 212).  For example, Tasneem Khan, Ed.D., noted that "[t]here is no new and material evidence that would change the severity of the claimant's impairments since the ALJ decision of 11/27/2007."  Id., (citing Tr. 204).  In short, the ALJ's hypothetical question to the VE contained all the limitations contained in the ALJ's RFC assessment and was supported by the record. Id., pp. 17-21.

As to Bougalis's argument that the ALJ did not properly consider the VA's 100% disability determination, the Commissioner responded that disability assessments from other government agencies are not binding on the SSA, and, at any rate, the VA's determination did not provide relevant insight into Bougalis's condition.  Id., 21-23. Lastly, with respect to Bougalis's contention that the ALJ should have considered her PTSD and fibromyalgia, the Commissioner noted that Bougalis's fibromyalgia was diagnosed after her date last insured, and Bougalis did not state what additional limitations the ALJ should have included in her RFC assessment as a result of these conditions.  Id., pp. 23-24.

In reply, Bougalis reiterated that the record was not fully developed as to her residency, noting that the record demonstrates that she had lived in both Arizona and Minnesota.   Plaintiff's Reply to Defendant's Memorandum in Support of Summary Judgment ("Pl.'s Reply"), pp. 1-2 [Docket No. 22].   Bougalis also contended that, even if the prior ALJ's RFC was recited verbatim at the hearing, it does not show what evidence was considered by the first ALJ or the reasoning behind his RFC assessment, and, therefore, the Court could not conduct an effective review.   Id., p. 2.   In addition, Bougalis indicated that at least some of the evidence of worsening physical and mental impairments was relevant to the period prior to the date last insured.   Id., pp. 2-3.

Bougalis further noted that Macaulay and Merrill, who had treated Bougalis for many years, were well qualified to evaluate her mental health and should have been afforded more credibility by the ALJ.   Id., pp. 3-4.   Bougalis disagreed with the ALJ's determination that the statements of Macaulay and Merrill were inconsistent with the record as a whole, and consequently, the ALJ did not give good reasons for discounting their opinions.   Id., pp. 5-7.

With respect to the hypothetical question posed to the VE, Bougalis argued that the record was not clear whether the prior ALJ's RFC was accurately restated as part of the question, and, in addition, the question did not "capture the concrete consequences" of Bougalis's impairments in the area of concentration, persistence or pace.   Id., pp. 7-8. Finally, Bougalis again maintained that the ALJ failed to consider the VA's 100% disability rating and the effect of her PTSD on her perception of pain.   Id., pp. 8-10.

## V.   RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY

A.     **Medical Evidence Bearing on Physical Imparaments**[9]

1.     **Hand Pain**

On May 14, 2007, Bougalis was examined by Theresa Huber, Certified Physician

Assistant, at the Twin Ports VA Clinic.  Bougalis told Huber:

> she has been doing a lot of typing, writing a book.  Since
> doing that she notices both her hands and forearms going
> numb.  She describes the numbness as running down the
> outside of both arms into her 4th and 5th fingers.  This
> improves after she is done working.  No symptoms at night.
> Also comments she has some discomfort at the elbows. No
> swelling or erythema.

(Tr. 799).  Huber's medical assessment of Bougalis provided:

> FROM[10] at both elbows, wrist and finger joints.  No swelling
> or erythema noted.  Mild tenderness to palpation of the ulnar
> groove at the elbow, both sides.  Pressure here also started
> to elicit the symptoms described above.  She also had a
> mildly + phalen[11] sign but neg tinnel[.][12]    Stren[g]th,
> sensation and pulses in both arms was [sic] norma[l.]

(Tr. 800).  Huber's treatment plan stated:

---

[9]     In Bougalis's application for benefits, she alleged neck pain and bilateral knee pain.  (Tr. 182).  However, as she did not address these alleged impairments in her challenges to the ALJ's decision, the Court does not summarize medical records bearing on these issues and treats them as waived.  Mortenson v. Astrue, Civ. No. 10-4976, 2011 WL 7478305, at *1 (D. Minn. Sept. 30, 2011) (failure to object to an ALJ's findings result in waiver) (citations omitted).

[10]     Full range of motion.

[11]     Phalen's maneuver is used to detect carpal tunnel syndrome.  "Phalen's Maneuver," Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health (7th ed.  2003), retrieved April 2, 2015 from http://medical-dictionary.thefreedictionary.com/Phalen%27s+maneuver.

[12]     The Hoffman-Tinel sign, also known as Tinel's sign, is elicited in cases of suspected carpal tunnel syndrome by tapping the wrist over the median nerve.  Jason M. Sansone et al., Jules Tinel (1879–1952) and Paul Hoffmann (1884–1962), 4 Clinical Med. & Res. 85, 85-89 (Mar. 2006).

> Ulnar nerve irritation/inflammation: issued elbow pads to rest arms when working.  She may want to limit her computer work till this is better.  She may use heat and nsaids prn[13] as well.  She also may have some mild CTS[14] starting given the mildly + phalen test so gave bilat wrist splints to use as well while typing.  Pt is agreeable to plan. . . .

(Id.).

On July 17, 2008, Bougalis was examined by radiologist Dr. Thiruvenkatasamy Dhurairajat the Twin Ports VA Clinic.  (Tr. 491-93).  X-rays of Bougalis's right hand revealed "[a] crescent-shaped ossific fragment . . . at the radial aspect of the third metacarpophalangeal joint, likely representing old avulsion[15] injury.  No other bony abnormalities are identified.  The soft tissues are grossly normal."  (Tr. 491).  Dr. Dhurairaj's report concluded that there were "[n]o findings to suggest arthritic process."  (Tr. 492).  X-rays of the left hand showed that "[t]he bones of the left hand are normal in appearance and without evidence of fracture subluxation.[16]  No significant degenerative changes are seen.  The soft tissues are grossly normal."  (Tr. 493).

On October 3, 2008, Bougalis saw Dr. Kara Denny for an annual examination at the Twin Ports VA Clinic.  (Tr. 718-22).  Bougalis told Dr. Denny that her hand pain had improved after taking calcium on an empty stomach in the morning.  (Tr. 719).

On November 23, 2009, Bougalis was examined by rheumatologist Dr. Ayub Semi at the Twin Ports VA Clinic.  (Tr. 651-55).  Bougalis presented with:

---

[13]    "PRN" stands for "pro re nata," which means "as the occasion arises; when necessary."  Stedman's at 1445.

[14]    "CTS" stands for carpal tunnel syndrome.
[15]    "A tearing away or forcible separation."  Stedman's at 175.

[16]    "An incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains."  Stedman's at 1716.

> intermmittent [sic] B hand stiffness and couple of PIPs and DIPs[17] joint tenderness with not[i]ce of heberden nodes[18] of rt 5th DIP joint.  Noticed hand swelling approx 1 yr ago, which resolved spontaneously, never recurred again.  [P]ain and morning stiffness in PIPs and DIPs are intermittent, though if EMS happened lasts for 2-3 hrs.  On the other hand, noticed pain and d[i]scomfort of hands with use, like typing.  [A]lso reported rt ring finger receiv[e]d trauma approx a year ago and since then her hand sxs mainly started.
>
> Reported finger tips become numb when exposed to cold, but never changed color. . . .

(Tr. 652).

Upon physical examination, Dr. Semi noted that Bougalis had good grip strength, minimal tenderness in the fingers, and no synovial thickening or active synovitis. (Tr. 654).  Dr. Semi further indicated that Bougalis's wrists had full range of motion and no synovitis.  (Id.).  X-rays of Bougalis's right hand produced the following result:

> Compared to 7/17/2008, punctate calcification is again seen at the medial margin of the distal interphalangeal joint of the fifth finger.  No underlying body abnormality is identified in that distribution.  A 2 mm bone fragment is again seen separated from the radial margin of the base of the proximal phalanx of the third finger, unchanged.  This could represent an old ununited chip fracture versus small accessory ossicle. No other bone or joint abnormality is noted. . . . Examination is essentially unchanged 7/17/2008.

(Tr. 486, 655).  X-rays of the left hand showed no bone or joint abnormality compared to July 17, 2008.  (Tr. 487, 655).

## 2. Chest Pain

---

[17]    "PIP" and "DIP" stand for proximal interphalangeal joint and distal interphalangeal joint, respectively.

[18]    "Heberden's nodes" are "exostoses about the size of a pea or smaller, found on the terminal phalanges of the fingers in osteoarthritis, which are enlargements of the tubercles at the articular extremities of the distal phalanges." Stedman's at 1221.

On December 18, 2009, Bougalis complained of shortness of breath on exertion and was examined by Dr. Amida Gallito at the Twin Ports VA Clinic.  (Tr. 643-44). During the examination, Bougalis denied any chest pain.  (Tr. 643).  A chest x-ray showed normal results.  (Id.).  An echocardiogram showed normal ejection fraction. (Id.).  Dr. Gallito explained to Bougalis that she could not assure her 100 percent that she had no coronary artery disease and that if she continued to have symptoms, there might be a need for a stress test and cardiology evaluation.  (Id.).  Bougalis stated that she would hold off on further testing and would try to increase her activity gradually to see if her symptoms were from deconditioning.  (Id.).

On December 29, 2009, Bougalis went to the emergency room at the Twin Ports VA Clinic and complained of chest pain in the center to right side of the chest, which she described as "[t]ightness, like a fist."  (Tr. 636).  According to Bougalis, deep breathing made the pain worse at times.  (Id.).  Bougalis stated that she had experienced pain for about a year, but it had become much worse over the past 2-4 weeks.  (Id.).  Bougalis indicated that her father had been hospitalized for four months and was doing poorly in the past two weeks and may die.  (Tr. 637).  Bougalis was examined by Dr. Seema Maddali.  (Tr. 633).  Dr. Maddali reported that Bougalis was physically well developed, well nourished, and was experiencing no acute distress.  (Tr. 635).  Dr. Maddali's assessment stated: "chest wall pain, reproducible and chronic in nature with a recent NL echo."[19]  (Id.).  Bougalis was given an electrocardiogram, which

---

[19]       "NL" presumably means "normal."

revealed a normal sinus rhythm.   (Id.).   Dr. Maddali prescribed Costochondritis[20] Indocin[21] and recommended that Bougalis avoid heavy lifting, pushing, or pulling.  (Id.).

On March 29, 2010, Bougalis reported to Dr. Gallito that her chest pain was better, "but sometimes when she gets stressed out, she has a pain in the chest." (Tr. 612).   Dr. Gallito informed Bougalis that anxiety can cause chest pain, but pulmonary or cardiac conditions can cause pain as well.  (Id.).  Bougalis stated that "she feels that her heart is fine, and she can clearly correlate the pain the chest in times of stress."  (Id.).  Dr. Gallito stated that she would "continue to observe the symptoms, but if [Bougalis] develops other character of the pain or develops new symptoms, or there is more concern for this, [Dr. Gallito would] consider further work-up."   (Id.).   A cardiovascular examination showed "[r]egular rhythm and normal rate."  (Tr. 613).

### 3.   Fibromyalgia

On April 5, 2011, Bougalis was examined by rheumatologist Dr. Elizabeth Chang. (Tr. 965-70, 1151-56).   Bougalis complained of chronic knee pain, neck and shoulder pain, and pain the hands after writing for more than five minutes.  (Tr. 965, 1151).   Dr. Chang diagnosed Bougalis with "chronic polyarticular arthralgias and patellofemoral syndrome with possible fibromyalgia."   (Tr. 967, 1154).   Dr. Chang recommended

---

[20]   "Inflammation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate, but without the local swelling typical of Tietze syndrome." Stedman's at 418.  "Costal" refers to the ribs.  Id. at 417.

[21]   Indocin is a brand name of indomethacin, which is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, ankylosing spondylitis (arthritis affecting the spine), shoulder pain caused by bursitis, and tendinitis.   U.S. National Library of Medicine, Indomethacin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html (last updated Sept. 1, 2010).

exercise, stress reduction, antidepressants, sleep optimization, and medications used for diabetic neuropathy such as Neurontin or Lyrica.  (Tr. 968, 1155).

### B.   Medical Evidence Bearing on Mental Impairments

### 1.   Cindy Macaulay

On September 12, 1994, Macaulay[22] completed a social history and assessment of Bougalis at the Vet Center in Duluth, Minnesota.  (Tr. 10-11).  Macaulay noted that Bougalis was "very slim, quick to smile and is always neatly dressed and well groomed." (Tr. 10).  Under "Clinical Impressions," Macaulay wrote:

> [Bougalis] was originally diagnosed with Post Traumatic Stress Disorder by her counsellor . . . in '92.  I have seen her three times individually and have spoken to her dozens of times and fully concur with that diagnosis.  I was concerned about her mental health before the VA turned down her disability request.  Since then, she went through the trial and sentencing of her perpetrator in Killeen, Texas.  I talked to her immediately after her return, and she indicated her symptoms have increased: Sleeping is very sporadic due to distressing dreams and generalized restlessness, she is numb and unable to concentrate (which makes school work difficult).  She feels vulnerable to both recriminations from her perpetrator and judging from her family and friends and her social and occupational function is minimal at this point. The sexual assault and the resulting court case have taken precious time and energy from her and her children.  She desperately needs ongoing psychological counseling and perhaps short term medication for sleep and or anxiety.  She reports no support system other than phone contacts with me and limited contact with her family.

(Tr. 11) (emphasis in original).

---

[22]     This assessment did not indicate the name of the treatment provider.  However, Bougalis represented in her brief that the report was completed by Cindy Macaulay. See Pl.'s Mem., p. 3.

On January 19, 2005, Macaulay conducted a therapy session with Bougalis via telephone. (Tr. 461). Macaulay indicated that Bougalis "is isolating, has very low energy and motivation, seeing a man who is controlling and secretive." (Id.).

On January 27, 2005, Bougalis had an in-person therapy session with Macaulay, during which Bougalis filled out paperwork for the Bay Pines sexual trauma program in Florida. (Id.). Macaulay diagnosed Bougalis with PTSD from military sexual trauma ("MST"). (Id.).

On March 4, 2005, Bougalis spoke with Macaulay concerning her anxiety about going to the Bay Pines program, being away from home, and having family members discover where she is and why she is there. (Id.). Bougalis also talked about her fears and dreams of going to law school and her desire to write a book. (Id.). Macaulay persisted in her diagnosis of PTSD from MST. (Id.).

On April 22, 2005, Bougalis told Macaulay that the Bay Pines program had been very successful for her. (Id.). Bougalis stated that she had made some friends and worked through some issues with counselors. (Id.). She also reported keeping in touch with some of the women from the program after returning to Minnesota. (Id.). Macaulay again diagnosed Bougalis with PTSD from MST, but noted that Bay Pines was "a very good thing for her." (Id.).

At an individual therapy session on May 13, 2005, Bougalis arrived with a woman named "D" from the Bay Pines program who had been visiting for the past week. (Id.). Bougalis and "D" talked about adjusting to life after the Bay Pines program. (Id.). Macaulay assessed Bougalis as suffering from PTSD from MST and noted that being back in Minnesota was a barrier to Bougalis's recover due to family issues. (Id.).

Macaulay also opined that being back in her home community is a barrier to Bougalis's recovery, and that "family issues are a big factor."  (Id.).

On May 31, 2005, Macaulay spoke with Bougalis by telephone.  (Id.).  Bougalis stated that she "[w]as planning to come in but got farther and farther behind – being late is a chronic concern for her and she gets frustrated when she continues to do this." Macaulay noted that Bougalis "is isolating, motivation is low . . . ."  (Id.).  Macaulay assessed Bougalis as suffering from PTSD from MST.

On November 14, 2006, Macaulay conducted a telephone session with Bougalis. (Tr. 462).  During the session, Bougalis talked about her plans to go to Greece with her mother in the fall, and her fears of being alone when her son leaves for college.  (Id.).

On June 21, 2007, Macaulay completed a "Mental Impairment Questionnaire" with regard to Bougalis.  (Tr. 284-89).  Macaulay stated that she had examined Bougalis "sporadically since 1994," but "[t]he distance from the Vet Center, [Bougalis's] limited finances for travel, and her extreme social anxiety makes sessions difficult."  (Tr. 284). Macaulay diagnosed Bougalis with PTSD and assigned her a GAF score of 50.  (Id.). Macaulay also indicated that Bougalis's highest GAF score from the previous year was 55.  (Id.).

As to treatment and response, Macaulay reported conducting "[s]poradic individual sessions with occasional phone contact – response to this contact is good but hard to sustain."  (Id.).  Macaulay's prognosis of Bougalis was "limited – her mental health and progress will be greatly affected by her ability to control her home environment [and] her daily activities.  Any un-asked for change is very threatening." (Id.).

Macaulay checked boxes on the form indicating that Bougalis suffered from the following:

- Appetite disturbance with weight change;

- Decreased energy;

- Generalized persistent anxiety;

- Difficulty thinking or concentrating;

- Recurrent and intrusive recollections of a traumatic experience, which are a source of market distress;

- Persistent disturbances of mood or affect;

- Apprehensive expectation;

- Emotional withdrawal or isolation;

- Vigilance and scanning;

- Sleep disturbance.

(Tr. 285).

With respect to Bougalis's mental abilities, Macaulay opined that Bougalis was "seriously limited, but not precluded" in her ability to "[u]nderstand and remember very short and simple instructions" and to "[a]dhere to basic standards of neatness and cleanliness."  (Tr. 286-87).

Macaulay further opined that Bougalis was "[u]nable to meet competitive standards" in the following areas:

- Remembering work-like procedures;

- Carrying out very short and simple instructions;

- Maintaining attention for two hour segment;

- Sustaining an ordinary routine without special supervision;

29

- Making simple work-related decisions;

- Performing at a consistent pace without an unreasonable number and length of rest periods;

- Asking simple questions or requesting assistance;

- Accepting instructions and responding appropriately to criticisms from supervisors;

- Getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;

- Being aware of normal hazards and taking appropriate precautions;

- Understanding and remembering detailed instructions;

- Carrying out detailed instructions;

- Setting realistic goals or making plans independently of others;

- Interacting appropriately with the general public;

- Maintaining socially appropriate behavior.

(Id.).

Macaulay determined that Bougalis had "[n]o useful ability to function" in the following areas:

- Maintaining regular attendance and being punctual within customary, usually strict tolerances;

- Working in coordination with or proximity to others without being unduly distracted;

- Completing a normal workday and workweek without interruptions from psychologically based symptoms;

- Responding appropriately to changes in routine work setting;

- Dealing with normal work stress;

- Dealing with stress of semiskilled and skilled work;

- Traveling in unfamiliar places;

- Using public transportation.

(Id.).

Macaulay reported that Bougalis did not have a low IQ or reduced intellectual functioning.  (Tr. 287).  Macaulay also stated that Bougalis's psychiatric condition did not exacerbate her experience of pain or other physical symptoms.  (Id.).

Macaulay checked boxes indicating that Bougalis had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and had experienced three episodes of decompensation within a 12-month period, each of at least two weeks duration.  (Id.).  Macaulay anticipated that Bougalis's mental impairments or treatment would cause her to be absent from work more than four days per month, and that Bougalis's impairments could be expected to last at least twelve months.  (Tr. 289). Finally, Macaulay noted that Bougalis had extreme issues relating with men.  (Id.).

On November 18, 2011, Macaulay wrote the following letter to Bougalis in Sun City, Arizona:

> I am writing to document your contact with the Vet Center between 2007 and 2009.  My records indicate six visits during that time period – two at the Vet Center and four phone visits.  I recall clearly during that time that you were very home-bound and had an extremely hard time being away from the comfort and security of your home and amongst other people, which is why we only got together when you had appointments forced on you (to renew your prescriptions) by the Twin Ports Out Patient Clinic.  This is in comparison to the years before when we met and/or spoke by phone quite frequently.  I would definitely say your PTSD and social anxiety got much worse during that time, making

> work impossible and contact with anyone other than your
> family extremely difficult. . . .

(Tr. 338).

On April 13, 2012, Macaulay wrote the following letter to Bougalis's counsel,

Andrew Muirhead, concerning the Commissioner's denial of benefits:

> I am writing to give some personal feedback about
> [Bougalis's] recent denial from Social Security in which some
> of the considered evidence was from my initial contact with
> her.  My initial contact with [Bougalis] was shortly after she
> returned to this area after discharge from the military and we
> continue to maintain contact to this day.  Over the years I
> have heard of her challenges with parenting, with being out
> in and interacting with the general public, with school and
> her attempts at employment, and I have observed marked
> deterioration in her ability to function consistently.  Since I
> first met her she has attempted many worksites and
> environments and continued to encounter barriers,
> especially after she came home from the VA's intensive
> treatment program at Bay Pines.  I believe she was
> unemployable at that time but she wanted to try and try she
> did.
>
> I believe by statements were misinterpreted when I said our
> contacts were sporadic.  The evaluator attributes this to
> [Bougalis's] less than serious mental health issues – I would
> argue the opposite, that she was so impaired she could not
> even come in to a relative safe place to talk and receive
> support.  And though I might not be an acceptable medical
> source for purposes of evaluating, I do offer almost twenty
> years of knowing her, talking with her and witnessing her
> emotional and physical withdrawal.

(Tr. 1244).

## 2.    Jeannette Merrill

On February 3, 2004, Bougalis saw Merrill for a review examination for PTSD.

(Tr. 348-49).  Bougalis stated that she is often late for appointments because she has

difficulty leaving her home.  (Tr. 348).   She also noted that her boss had cited her for

not going to meetings or completing reports on time.  (Id.).  Bougalis reported difficulty

keeping up with household chores and caring for her children.  (Id.).  Bougalis indicated that she had no friends and little socialization other than family, and often spends time "just sitting with little motivation."  (Id.).  In addition, Bougalis reported having poor sleep, terminal insomnia, chronic passive suicidal thoughts, increased anxiety, stress, depression, nightmares, and mistrust.  (Tr. 348-49).  Bougalis noted that she rarely opens her shades at home, often falls behind in paying bills, takes her psychiatric medications on an inconsistent basis, had irritability and difficulty concentrating, and had little interest in activities she had previously enjoyed.  (Tr. 348).

Merrill's examination notes indicated that Bougalis was casually dressed, had good hygiene, and appeared somewhat unkempt.  (Tr. 349).  Bougalis's had fair eye contact, slowed gait, slowed and very soft speech,[23] logical and goal-directed thoughts, and poor self-esteem with fair judgment and good insight.  (Id.).  Merrill noted that Bougalis appeared fatigued, tense and depressed.  (Id.).  Merrill also indicated that Bougalis was "oriented times four" but was not able to think abstractly.  (Id.).

Merrill diagnosed Bougalis with PTSD and severe problems with socialization, employment and trust.  (Id.).  Merrill assigned Bougalis a GAF score of 48.  (Id.).  Merrill summarized her findings as follows:

> This is a 40 year old female who is currently receiving 100% service connection for PTSD related to being sexually abused by a military chaplain while she was seeking marriage counseling from him.  She meets the criteria for PTSD and although she is currently working, it appears that her symptoms are so severe that she is in jeopardy of losing her job.  [Bougalis's] only treatment at this time is the medication management she is receiving through the Twin Ports Outpatient Clinic.  She is very ambivalent about further

---

[23]    Merrill noted that she had to ask Bougalis to "speak louder as her speech was almost a whisper."  (Id.).

> counseling and even states she is noncompliant with her
> medication.  This also attests to the severity of her illness at
> this time.

(Id.).

On April 22, 2005, Bougalis's told Merrill that she had just returned from a 28-day PTSD program but was still feeling "somewhat depressed."  (Tr. 391).  Bougalis stated that she was not sleeping well, had poor energy, and was not very social.  (Id.). Bougalis denied any homicidal or suicidal ideation or situational stressors.  (Id.).  A mental status examination revealed that Bougalis was well groomed and calm, had good eye contact, normal speech rate, organized and goal-directed thoughts, and good insight and judgment.  (Id.).  Merrill also noted that Bougalis's affect was flat and her mood was depressed.  (Id.).

On July 22, 2005, Merrill saw Bougalis for a medication follow-up and management appointment at the Twin Ports VA Clinic.  (Tr. 457-58).  Bougalis denied any side effects to her medications but reported still feeling depressed.  (Id.).  Merrill noted that Bougalis's mood was dysthymic.  (Tr. 458).  Bougalis indicated that she was experiencing nightmares but denied any suicidal or homicidal ideation.  (Id.).  Bougalis also reported going swimming, taking walks with her mother, and talking on the phone every day with a friend she met in treatment.  (Id.).  Merrill's mental status exam notes indicated that Bougalis was well groomed but "somewhat restless sitting in the chair." (Id.).  Merrill stated that Bougalis's eye contact was good, her speech was of a normal rate and volume, and her affect was full.  (Id.).  Bougalis's thoughts were organized and goal directed, and her insight and judgment were good.  (Id.).

On December 22, 2005, Bougalis had a medication follow-up and management appointment with Merrill at the Twin Ports VA Clinic.  (Tr. 850-52).  Bougalis told Merrill

that she had not been sleeping well and typically went to bed at 4:00 or 5:00 in the morning.  (Tr. 850).  Bougalis also stated that she is living with a girlfriend she met in treatment in Florida and that it was going well.  (Id.).  Bougalis noted that she occasionally goes off her medications, which causes her to be moody and irritable, but she feels better after resuming the medication.  (Id.).

Merrill's mental status exam notes indicated that Bougalis was well groomed, sat calmly in the chair, had good eye contact, normal rate and volume of speech, full affect, dysthymic mood, organized and goal-directed thoughts, no suicidal or homicidal ideation, and insight and judgment adequate for daily living.  (Id.).  Merrill noted that Bougalis became teary several times during the session.  (Id.).

On April 11, 2006, Bougalis had another appointment with Merrill at the Twin Ports VA Clinic.  (Tr. 839-41).  Bougalis informed Merrill that she does not always have money to come down for appointments.  (Tr. 840).  Bougalis reported having episodes of dizziness that go away after eating; however, this caused her to gain approximately 20 pounds.  (Id.).  Bougalis also indicated having poor sleep, irritability, and increased stress because "her mother has been doing more relying on her and . . . she is not very assertive in saying no."  (Id.).  Bougalis stated that she continues to do her grocery shopping late at night because she does not like being around large amounts of people.  (Id.).  Bougalis noted that she really enjoys scrapbooking and does it "any chance she gets."  (Id.).

Merrill's examination notes stated that Bougalis was well groomed, sat calmly in the chair, had good eye contact, normal rate and volume of speech, full affect, dysthymic mood, organized and goal-directed thoughts, no suicidal or homicidal

35

ideation, and insight and judgment adequate for daily living.  (Id.).  Merrill noted that Bougalis was not in immediate danger to herself or others and that her judgment was sufficient for safety.  (Id.).

On September 5, 2006, Bougalis saw Merrill for a medication management appointment.  (Tr. 823-25).  Bougalis denied any side effects to her medications and stated that her compliance was good.  (Id.).  Bougalis told Merrill that her moods had been fluctuating and that it is difficult to stay on task.  (Tr. 824).  For example, Bougalis would start scrapbooking, then go to the bathroom and start cleaning in the bathroom.  (Id.).  Bougalis noted that she goes from task to task and never completes anything.  (Id.).  In addition, Bougalis indicated that her sleep and energy levels were poor, but her appetite was good.  (Id.).  Bougalis was also considering telling her children that she had been raped in the military.  (Id.).

Merrill's assessment of Bougalis stated that Bougalis was well groomed, sat calmly, had good eye contact, normal rate of speech, flattened affect but "capable of smiling," and insight and judgment adequate for daily living.  (Id.).  Merrill noted that Bougalis was not in immediate danger to herself or others, and that her judgment was sufficient for safety.  (Id.).

On March 9, 2007, Bougalis had a telephone appointment with Merrill because she had a migraine and did not want to travel.  (Tr. 803-04).  Bougalis reported "doing quite well" and sleeping about 9 hours per night, although she did not go to bed until 2:00 or 3:00 in the morning.  (Tr. 804).  In addition, Bougalis indicated that her appetite had improved and her energy levels were good.  (Id.).  Bougalis had also reviewed the court transcripts from the trial of the man who raped her and was trying to "write [her]

story." (Id.). However, Bougalis noted that her friend from the Bay Pines Treatment Program would be moving back home in September and that this would be difficult for her. (Id.). She also indicated that she was having difficulty concentrating and asked whether Adderall would help. (Id.). Merrill told Bougalis that a psychiatrist would have to prescribe the medication. (Id.).

On June 19, 2007, Bougalis saw Merrill for a medication follow-up and management appointment. (Tr. 790-94). Merrill assessed Bougalis as follows:

> This is a 44-year-old female veteran who prior to my appointment saw the psychiatrist for her yearly evaluation. She was very uncomfortable in the appointment with the male psychiatrist, so we had our female RN sit in with the appointment. She tells me that her mood is more depressed. We have attempted in the past to try to get her medications up to a more therapeutic dose; however, she has side effect every time we try to do that. Today she was teary. She does not have any active suicidal ideation, but has some passive thoughts that it would be better if she just did not wake up in the morning. She has no plan or no intent to harm herself. She is having increased nightmares, but she is also undergoing a lot of stress. Family problems, which has been an ongoing thing with her and she has been trying to get her social security disability and apparently she is working with an attorney and the attorney somehow got the hearing scheduled for Hibbing, which she does not want. She said she does not go to the grocery store. She has a friend living with her, a female friend that she met when she was in treatment. She said the only time th[at] she does go out is at night. Having some problems with her family, irritable. Uses no alcohol of tobacco products. Her appetite is fair, although she has gained a little bit of weight. She continues to see Cindy at the Vets Center in Duluth; however, they had their conversations in counseling via telephone, because the veteran has a difficult time getting [out] of her house. She has a son that has attention deficit disorder, and apparently one day she took one of her son's Adderall and apparently, she said, she could function so much better, she said her mind was clear, she could concentrate better and she was able to stay focused and do paperwork. She did bring this up to the psychiatrist;

however, his note was not in the computer yet, so I told her
that I would discuss with him before we would prescribe that
for her.

(Tr. 792).

Merrill noted that Bougalis was "appropriately groomed, but dressed in black, which was a little unusual for the day, which was quite a warm day." (Id.). Merrill stated that Bougalis sat calmly, but appeared tense. (Id.). Bougalis became teary several times during the interview while talking about her stress. (Id.). Bougalis's eye contact was intermittent. (Id.). Her speech was soft, but a normal rate. (Id.). Her affect was flat and her mood was depressed. (Id.). Bougalis's thoughts were organized and goal directed. (Id.). Merrill indicated that Bougalis had some passive suicidal ideation, but no plan or intent. (Id.). Merrill opined that Bougalis's insight and judgment appeared appropriate for daily living. (Id.). Merrill suggested that Bougalis could decrease her stress through exercise. (Tr. 793-94).

Merrill's risk assessment of Bougalis indicated that Bougalis was not of immediate danger to herself or others, that her judgment was sufficient for safety, and that she had the capacity to understand the risks and benefits of treatment. (Tr. 793). Merrill noted that Bougalis did not require immediate hospitalization and had the ability to seek emergency help if needed. (Id.). Merrill indicated that Bougalis's general course of psychiatric illness was worsening. (Id.)

On June 20, 2007, Merrill completed a Mental Impairment Questionnaire regarding Bougalis. (Tr. 464-69). In the questionnaire, Merrill reported that she saw Bougalis every 6 months for 30 minutes. (Tr. 464). Merrill diagnosed Bougalis with PTSD, knee pain, back, and neck pain, and family stress. (Id.). She assigned Bougalis

a GAF score of 52 and noted that Bougalis's highest GAF score from the past year was 50. (Id.).

Merrill stated that Bougalis was currently on psychotropic medications, and that Bougalis had a fair response to the medications. (Id.). Merrill listed the medications as Bupriopion[24] (100 mg), Divalproex[25] (250 mg), and Doxepin[26] (25-50 mg). (Id.). Merrill described the side effects of these medications as "fatigue, difficulty in crowds and being around males, difficulty [with] concentration [and] staying on task." (Id.).

Merrill indicated that mental status examination showed that Bougalis suffered from nightmares, apprehensiveness, irritability, anger, "dyscontrol," recurrent suicidal ideation, psychomotor retardation, poor speech pattern, and depression with attendant anxiety. (Id.). Merrill gave Bougalis a "guarded" prognosis. (Id.).

Merrill checked boxes on the form indicating that Bougalis had the following signs and symptoms:

- Anhedonia or pervasive loss of interest in almost all activities;

- Appetite disturbance with weight change;

- Decrease energy;

---

[24]   Bupropion, also known as Wellbutrin, is an antidepressant used to treat depression, bipolar disorder, seasonal affective disorder, and attention deficit hyperactivity disorder (ADHD). U.S. National Library of Medicine, Bupriopion, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html (last updated Sept. 15, 2014).

[25]   Divalproex is an anticonvulsant used to treat seizures, bipolar disorder, and migraine headaches. U.S. National Library of Medicine, Divalproex (By mouth), PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009998/ (last accessed April 8, 2015).

[26]   Doxepin is a tricyclic antidepressant used to treat depression and anxiety symptoms. U.S. National Library of Medicine, Doxepin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682390.html (last updated Dec. 15, 2014).

- Thoughts of suicide;

- Blunt, flat or inappropriate affect;

- Feelings of guilt or worthlessness;

- Generalized persistent anxiety;

- Mood disturbance;

- Difficulty thinking or concentrating;

- Recurrent and intrusive recollections of a traumatic experience, which are a source of market distress;

- Psychomotor agitation or retardation;

- Pathological dependence, passivity or aggresivity;

- Persistent disturbances of mood or affect;

- Apprehensive expectation;

- Paranoid thinking or inappropriate suspiciousness;

- Seclusiveness or autistic thinking;

- Emotional withdrawal or isolation;

- Persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation;

- Motor tension;

- Emotional lability;

- Vigilance and scanning;

- Easy distractibility;

- Sleep disturbance;

- Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and

> sense of impending doom occurring on the average of at least
> once a week.

(Tr. 465).

Merrill checked boxes indicating that Bougalis was "seriously limited, but not precluded" in the areas of understanding and remembering very short and simple instructions; carrying out very short and simple instructions; asking simple questions or requesting assistance; and being aware of normal hazards and taking appropriate precautions.  (Tr. 466).

Merrill checked boxes indicating that Bougalis was "unable to meet competitive standards" in the following areas:

- Remembering work-like procedures;

- Maintaining attention for two hour segment;

- Maintaining regular attendance and being punctual within customary, usually strict tolerances;

- Sustaining an ordinary routine without special supervision;

- Performing at a consistent pace without an unreasonable number and length of rest periods;

- Accepting instructions and responding appropriately to criticism from supervisors;

- Understanding and remembering detailed instructions;

- Carry out detailed instructions;

- Setting realistic goals or making plans independently of others;

- Interacting appropriately with the general public;

- Maintaining socially appropriate behavior;

- Adhering to basic standards of neatness and cleanliness.

(Tr. 466-67).

Merrill checked boxes indicating that Bougalis had "no useful ability to function" in the following areas:

- Working in coordination with or proximity to others without being unduly distracted;

- Making simple work-related decisions;

- Completing a normal workday and workweek without interruptions from psychologically based symptoms;

- Getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;

- Responding appropriately to changes in a routine work setting;

- Dealing with normal work stress;

- Dealing with stress of semiskilled and skilled work;

- Travelling to unfamiliar places;

- Using public transportation.

(Id.).

Merrill noted that Bougalis did not have a low IQ or reduced intellectual functioning. (Tr. 467). Merrill also stated that Bougalis's psychiatric condition did not exacerbate her experience of pain or any other physical symptom. (Id.).

Merrill indicated that Bougalis had extreme restriction of activities of daily living, extreme difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and that Bougalis suffered from three episodes of decompensation within a 12 month period, each of at least two weeks duration. (Id.).

Merrill checked boxes indicating that Bougalis had a "[m]edically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least two

years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 468). Merrill also checked the box indicating that Bougalis had an "anxiety related disorder and complete inability to function independently outside the area of one's home." (Id.).

Merrill noted that, on the average, Bougalis's impairments or treatment would cause her to be absent from work more than four days per month. (Tr. 469). Merrill further stated that Bougalis's impairments have lasted or could be expected to last at least twelve months. (Id.).

On February 11, 2008, Bougalis saw Merrill for a medication follow-up and management appointment at the Twin Ports VA Clinic. (Tr. 763). Merrill assessed Bougalis as follows:

> This is a 44-year-old veteran, who comes in today and complains of being very, very tired. Apparently she has a lot of stress in her life. She had a woman that she met when she went to her treatment program in Florida, who was living with her and left about 10 days ago, leaving her with some debts that she had signed for, for the friend. She is upset about that and angry, and ends up blaming herself for what this friend did. We spent some time trying to do some cognitive restructuring with her; however, she continues to blame herself and does not understand how she can change. She also is having some problems between her mother and her father. Her father is ill with leukemia and is going through chemo therapy. She also is having some problems with her middle son, and when I asked why she stopped the medications she says she knows she should be taking them, but she has not been. She denies any suicidal or homicidal ideation. She is sleeping very poorly. She goes to bed between 2 and 3 a.m. She says she has

difficulty falling asleep, but she says she awakens with a lot of anxiety, and sometimes does not want to wake up because of that.  She is having some higher levels of anxiety.  She was quite teary in my office today, with quite a bit of self blame.  The one positive thing is that she did make an appointment with Cindy, at the Vet's Center, and is going to see Cindy today.  She uses no alcohol, and she uses no tobacco products.

(Tr. 764).

Merrill's mental status examination of Bougalis indicated that Bougalis was of normal weight, appropriately groomed, had good eye contact, but was restless.  (Id.). Bougalis's speech was soft, but at a normal rate, and with a flat affect.  (Id.).  Bougalis's mood was depressed, and she was teary for most of the session.  (Id.).  Her thoughts were organized and goal directed, but she presented a lot of self-blame.  (Id.).  She denied suicidal or homicidal ideation, and her insight and judgment appeared appropriate for daily living.  (Id.).  Merrill opined that Bougalis was "not of immediate danger to self or others.  Judgment is sufficient for safety.  The patient has the capacity to understand the risks and benefits of treatment.  [She] does not require immediate hospitalization and has the ability to seek emergency held in the even it is needed. Veteran was given the VA National Suicide Hotline Number.  [She] was advised to call that number if [she] should have self harm thoughts."  (Tr. 765).

Merrill's treatment plan for Bougalis stated:

I did discuss with her some ways that she can handle the difficult stressful situations she is in, whether she will do that or not she claims she will handle the situation.  I encouraged her to cut it off with this friend, who left here about 10 days ago.  Apparently the friend was just using her for money. She is going to try to do those things.  I am going to get her back on her medications again.  We will get them sent out to her opti-fill.  The veteran knows that she can call me if needed.  She will see Cindy today at the Vet's Center for some counseling and I encouraged her to do that as often as

needed.  She will follow up per scheduled appointment for medication management and brief supportive therapy.

(Tr. 766).

On June 17, 2008, Bougalis saw Merrill for a medication follow-up and management appointment.  (Tr. 727).  Bougalis reported she was not having any side effects from her medications and was "doing better."  (Tr. 728).  Bougalis stated that her son had received a DWI, her father was ill, and her former live-in girlfriend owed her money and had been calling her frequently.  (Id.).  Merrill noted that Bougalis did not have a good sleep pattern because she goes to bed between three or four in the morning, gets up around eight, then falls back to sleep during the day.  (Id.).  Bougalis also said her energy levels were fair, and improved while taking Dexedrine.[27]  (Id.).  She also denied using drugs, alcohol, or tobacco products.  (Id.).

Merrill's mental status examination stated as follows:

> The veteran is of a normal weight.  She was appropriately groomed, pretty tense sitting in the chair, which is a norm for her.  Her eye contact though was good. Speech was rather soft but a normal rate.  Her affect was somewhat constricted, which is also a norm for her, and her mood was dysthymic. Her thoughts were organized and goal directed.  She is denying any suicidal or homicidal ideation.  Her insight and judgment appear appropriate for daily living.

(Id.).

Merrill's treatment plan indicated that she renewed Bougalis's medications and discussed ways to be more assertive with her former friend.  (Tr. 729).  Merrill noted

---

[27]     Dexedrine is a brand name of dextroamphetamine, which is a central nervous system stimulant used to treat ADHD in adults and children, as well as narcolepsy. U.S. National Library of Medicine, Dextroamphetamine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605027.html (last updated Oct. 1, 2010).

that Bougalis was angry over the situation with her friend and felt she had been taken advantage of.  (Id.).   Merrill and Bougalis discussed whether this was a pattern in Bougalis's life that she should take a look at.  (Id.)  Merrill scheduled a follow-up appointment for medication management and re-supportive therapy.  (Id.).

On January 13, 2009, Merrill spoke with Bougalis via telephone, as Bougalis was visiting her father in the hospital.  (Tr. 707).  Bougalis told Merrill she was feeling increased stress because her parents were getting older and needed help.  (Id.). Bougalis requested an increase of her Adderall[28] dosage because she reported having no energy to complete tasks, and felt depressed.  (Id.).  Bougalis denied suicidal or homicidal ideation.  (Tr. 708).  Merrill indicated that she would submit a prescription for an increase in Adderall dosage.  (Id.).

On October 28, 2009, Bougalis saw Merrill for a medication follow-up and management appointment.  (Tr. 661).  Bougalis reported that her aunt in Chicago had passed away, that her father was receiving chemotherapy for leukemia, and that she was trying to be supportive of her mother.  (Tr. 663).  Bougalis stated she had not had any medication and had been drinking two to three beers at night to fall asleep.  (Id.). Merrill cautioned Bougalis about her drinking, and Bougalis responded that she normally did not drink but needed it to sleep.  (Id.).  Bougalis reported that she was getting maybe three hours of sleep each night if she has a couple beers.  (Id.).  Merrill noted

---

[28]    Adderall is central nervous system stimulant containing amphetamine and dextroamphetamine and is used to treat ADHD and narcolepsy.  U.S. National Library of Medicine, <u>Dextroamphetamine and Amphetamine</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html (last updated Aug. 1, 2010).

that Bougalis's mood was "sad and depressed as usual," and that she appeared "tired out." (Id.).

Merrill's mental status examination indicated:

> The veteran is a short female appropriately dressed. She sat calmly. Her eye contact was good. Speech was very soft but a normal rate. Her affect was constricted and her mood was depressed. She did tear up several times during the interview. Her thoughts though were organized and goal directed. She is denying any suicidal or homicidal ideation. Her insight and judgment are appropriate for daily living.

(Id.). Merrill's treatment plan indicated that she would order Zolpidem,[29] Bupriopion, Amphetamine and Dextroamphetamine for Bougalis. (Id.). Merrill instructed Bougalis that she should not use any alcohol. (Id.). Merrill encouraged Bougalis to return to counseling at the Veteran's Center. (Id.).

On December 18, 2009, Bougalis saw Merrill for a medication follow-up and management appointment. (Tr. 640). Merrill's notes indicated that Bougalis was "adequately groomed, sat calmly. Eye contact was good. Speech is soft but a normal rate. Affect was constricted and mood was depressed. Thoughts were both organized and goal directed. She is denying any suicidal or homicidal ideation. Her insight and judgment appears appropriate for daily living." (Tr. 641). Merrill's assessment of Bougalis stated:

> [Bougalis] is denying any side effects to her meds except today she appears more depressed and a bit on the irritable side. Her father is undergoing chemotherapy and has been in the hospital down in Minneapolis for about four months

---

[29]   "Zolpidem is used to treat insomnia (difficulty falling asleep or staying asleep). Zolpidem belongs to a class of medications called sedative-hypnotics. It works by slowing activity in the brain to allow sleep." U.S. National Library of Medicine, Zolpidem, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last updated Sept. 15, 2013).

> while he is going through this and apparently he is not doing
> well. She has been down there the whole time staying in
> building 10 with her mother. She denies any suicidal or
> homicidal ideation. Said she does not leave the hospital
> until about 11:00pm but it takes her until about 3:00am to fall
> asleep but once she falls asleep, she sleeps sometimes until
> 8:00 or 10:00, but she said she would not sleep at all if she
> did not take the Zolpidem. Her appetite seems to be okay.
> Her energy level is very poor. She uses no alcohol and no
> tobacco products. She gets very involved in her family and
> caring for her mother her father and feels like she really
> needs to be there for them. We have talked in the past
> about therapy for her. She really does need to get some
> therapy. Right now she said she would not be able to do
> that because she is very involved with taking care of her
> dad, but she is going to apply for vocational rehab.

(Tr. 642). Merrill's treatment plan stated that she will increase Bougalis's dosage of

bupropion. (Id.).

On January 8, 2010, Bougalis spoke with Merrill by telephone and complained of

increased stress. (Tr. 627). Merrill noted that Bougalis sounded irritable and suggested

increasing Bougalis's antidepressant dosage. (Id.). Merrill indicated that she would

schedule Bougalis for an appointment with Dr. Barton, a psychiatrist. (Id.). On January

11, 2010, Merrill spoke with the pharmacist to increase Bougalis's dosage of Adderall.

(Tr. 628).

On March 29, 2010, Bougalis met with Merrill and complained of increased

stress. (Tr. 615). Bougalis stated that her father had end-stage leukemia and was in a

bad mood all the time. (Id.). However, Bougalis indicated that she does stand up to

him. (Id.). Bougalis reported having very poor energy, but Merrill noted that Bougalis

was not describing any major depression. (Id.). Bougalis denied suicidal or homicidal

ideation. (Id.). Bougalis indicated that she was sleeping better—at least six or seven

hours—after taking Zolpidem.  (Id.).  Bougalis stated that she was putting all her energy into taking care of her father and supporting her mother.  (Id.).

Merrill noted that Bougalis's affect was variable, and her mood was normothymic. (Id.).   Bougalis's thoughts were organized and goal directed, and her insight and judgment were appropriate for daily living.  (Id.).

On August 26, 2010, Bougalis reported to Merrill that she was going to be moving to Arizona.  (Tr. 601).  Bougalis indicated that, since her father died, she had not been getting along with her mother or brothers and felt the need to leave Minnesota. (Id.).  Bougalis stated that she felt better and more supported when she was in Arizona. (Id.).  Bougalis reported going to bed at 4 or 5 o'clock in the morning, then sleeping 8 hours, but with increased nightmares.  (Id.).  Bougalis indicated that her appetite had been good, and that she had been using no alcohol, tobacco, or illicit drugs.  (Id.).

Merrill noted that Bougalis's affect was somewhat constricted, her mood was dysthymic, and she appeared "quite teary."  (Id.).   However, Merrill stated that Bougalis's thoughts were organized and goal directed, with no homicidal or suicidal ideation, and her insight and judgment were appropriate for daily living.  (Id.).

### 3.    Other Evidence Bearing on Mental Impairments

On July 2, 2004, the Department of Veterans Affairs ("VA") determined that Bougalis was 100% disabled as a result of PTSD with prominent depressive features. (Tr. 350-55).  A review examination by the VA revealed that Bougalis had the following ailments:

- Chronic suicidal thoughts;

- Appeared fatigued, tense and depressed;

- Daily intrusive thoughts and nightmares of abuse while in service;

- Hypervigilance, anxiety, isolation and fear;

- Difficulty concentrating;

- Poor self-esteem with fair judgment;

- Severe problems with socialization and employment;

- GAF score of 48.

(Tr. 351).  The VA also noted that an evaluation of 100%disability is assigned

> whenever there is evidence of total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

(Tr. 351-52).

On June 19, 2007, Bougalis was examined by psychiatrist Dr. Larry Broom at the

Twin Ports VA Clinic.  Dr. Broom stated:

> [Bougalis's] state of apprehensiveness/irritability/anger dyscontrol persists and has worsened recently because of stressors . . . . The re-living of intolerable scenarios as nightmares has worsened recently and are now -- nightly; her level of apprehensiveness precludes completing projects and there may be an element of attention deficit disorder; sleep pattern is fitful and non-restorative; she derives some pleasure from scrapbooking, reading books of true crimes, and watching some TV; experiences some fatigue; appetite is adequate-- has gained ~ 20 lbs.; has experienced recurrent suicidal ideation with 2-3 suicide acts since the sexual assault; presently, she is not experiencing suicidal ideation, but would be pleased to fall asleep and not awaken the next morning-- no ETOH intake.

(Tr. 795).  Dr. Broom noted that Bougalis was

> somewhat subdued, pleasant, verbal, and soft-spoken; adequately dressed and groomed; mild psychomotor retardation was evident and [eye contact] was rather poor; speech pattern was of rather normal prosody; mood was moderately depressed with attendant anxiety; affect was moderately constricted with an occasional smile; no [suicidal or homicidal ideation].

(Id.).  Dr. Broom diagnosed Bougalis with chronic PTSD and assigned her a GAF score of 52, which indicated moderate symptoms.  (Id.).  Dr. Broom opined that Bougalis was "rather depressed.  Her present [medication] regimen is very adequate if she could just tolerate increasing at least the Bupropion."  (Id.).

In October, 2008, Bougalis saw Dr. Kara Denny for an annual exam at the Twin Ports VA Clinic.  (Tr. 719-22).  Dr. Denny noted that Bougalis's depression was "well controlled.  No suicidal or homicidal ideation."  (Tr. 719).

On August 24, 2011, Bougalis was examined by psychiatrist Dr. Gregory J. Davis at the Veterans Affairs Medical Center in Phoenix, Arizona.  (Tr. 916-19).  Dr. Davis's progress notes indicated that Bougalis's last suicide attempt was in 2010, after her father passed away.  (Tr. 916).

**C.   State   Agency   Reviewing   Physicians'   and   Psychologists'  Consultative Reports**

State Agency examiner Elliot Salk, Ph.D. reviewed Bougalis's medical records and completed a mental RFC assessment of Bougalis on December 29, 2010.  (Tr. 187-89, 192-94).  Dr. Salk summarized the medical evidence of record as follows:

- As to activities of daily living, Bougalis was afraid to be around people, has panic attacks, gets confused and forgets to go to doctors' appointments, cannot leave the house, cannot focus and keep track of things, stays in her pajamas for days at a time, cooks only simple meals, rarely does housework, only talks to her mother, and wears a knee brace.

- In February, 2004, VA records from showed that Bougalis appeared unkempt, had good hygiene, slowed gait, slowed and soft speech, and a GAF score of 48.

- In July, 2004, the VA rated Bougalis 100 percent disabled from PTSD with prominent depressive features.

- In August, 2004, records from the Wisconsin VA Clinic indicated that Bougalis had an "okay" appetite, clean appearance, "childlike" affect, appeared anxious and at times tearful, and was not assertive with how others treated her.  Bougalis's GAF score was 56.

- In February, 2005, records from the Wisconsin VA Clinic showed that Bougalis weighed 124 pounds and had normal range of movement of joints while squatting and duck-walking.

- In April, 2005, the Florida VA Medical Center diagnosed Bougalis with PTSD from military sexual trauma with recurrent major depressive disorder.  Bougalis's GAF score was 45 upon discharge, and mental status was within normal limits.  Bougalis also had a history of suicidal thoughts.

- In July, 2005, an examination at the Minneapolis VA Medical Center revealed an "unremarkable" cervical spine, full range of movement of the back upon physical examination, decreased extension of the neck, right lateral bending of 30 degrees with pain upon palpation of the right trapezius, and some spasms in the area.

- In July, 2005, a mental status examination at the Minneapolis VA Medical Center showed that Bougalis was feeling depressed and would like to increase her medications.  Bougalis's appetite was good, appearance was normal but restless, affect was full, eye contact and speech were normal, and her insight, judgment and orientation were good.

- In December, 2005, a mental status examination at the Twin Ports VA Clinic showed dysthymic mood, poor sleep, normal appearance, good eye contact, normal speech, and full affect, organized thoughts, and adequate insight and judgment. Bougalis became teary several times during the examination.

- In July, 2006, Bougalis reported increased stress and continuing issues with mood.

- In September, 2006, records from the Twin Ports VA Clinic indicated that Bougalis's moods had been fluctuating. Bougalis reported difficulty staying on task, feeling tired all the time, but not taking naps. A mental status examination showed a flattened affect but no depression. Bougalis was worsening.

- In May, 2007, VA records indicated that Bougalis weighed 144 pounds with a BMI of 28.2, full range of movement of both elbows, wrists, and finger joints, and a mildly positive Phalen sign.

- In June, 2007, VA records suggested that Bougalis had PTSD. Bougalis's prognosis was limited. Bougalis had many symptoms with marked and extreme functional limitations.

- In June, 2007, Bougalis was examined at the Twin Ports VA Clinic. Bougalis was uncomfortable with the male psychiatrist. Bougalis was teary, her mood was more depressed, her appetite was fair, and she had gained a bit of weight. A mental status examination revealed normal appearance, intermittent eye contact, soft speech, good eye contact, passive suicidal ideation, and appropriate judgment and insight.

- In June, 2008, mental status examinations at the Twin Ports VA Clinic showed that Bougalis is trying to figure out how to be more assertive with a friend who wronged her.

- In February, 2008, Bougalis reported having issues with a roommate and blamed herself for the problems the roommate caused. Bougalis also noted that her father was ill. Bougalis's mental status was "remarkable" with flat affect and depressed mood. Bougalis appeared teary and restless, but her thought judgment and insight were appropriate for daily living.

(Tr. 865-66).

Based upon these records, Dr. Salk considered Listing 12.04 (Affective Disorders) and Listing 12.16 (Anxiety-Related Disorders) and found that Bougalis's

impairments did not satisfy the paragraph A criteria of the Listings.  (Tr. 189).  As to the paragraph B criteria, Dr. Salk determined that Bougalis had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.  (Id.).  Dr. Salk found that the evidence did not establish the presence of the paragraph C criteria.  (Id.).

Dr. Salk determined that Bougalis was not significantly limited in her understanding and memory, except that Bougalis was moderately limited in her ability to understand and remember detailed instructions.  (Tr. 192-93).

Dr. Salk found that Bougalis was not significantly limited in the area of sustained concentration and persistence, except that Bougalis was moderately limited in her ability to carry out detailed instructions, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination or proximity to others without being distracted by them, and her ability to complete a normal workday or workweek without interruptions from her psychological impairments.  (Tr. 193).

As to the area of social interaction, Dr. Salk concluded that Bougalis was not significantly limited, except that Bougalis was moderately limited in her ability to interact appropriately with the general public.  (Tr. 193-94).

With respect to adaptation limitations, Dr. Salk determined that Bougalis was moderately limited in her ability to respond appropriately to changes in the work setting, but was not significantly limited in all other areas.  (Tr. 194).

Dr. Salk noted that the medical records indicated that Bougalis had been seen for psychiatric treatments once every three to four months, and that the medical evidence of record indicated that Bougalis was more dysthymic than depressed (Tr. 194). The records further indicated that Bougalis typically appeared for treatment sessions appropriately groomed but sometimes tense, and demonstrated good eye contact, organized and goal-oriented thoughts, no suicidal or homicidal ideation, and insight and judgment appropriate for daily living. (Id.). Dr. Salk opined that there was no clinical change in circumstance since the previous ALJ decision, and therefore the previous determination of nondisability should be adopted. (Id.).

State Agency physician Nadine Keer, D.O. completed a physical RFC assessment of Bougalis on January 3, 2011. (Tr. 190-92). Dr. Keer opined that Bougalis could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push or pull. (Tr. 190). Dr. Keer also determined that Bougalis could frequently climb ramps or stairs, frequently kneel and crawl, and was unlimited in her ability to balance, stoop (i.e. bend at the waist), and crouch, but could never climb ladders, ropes, or scaffolds. (Tr. 191). Dr. Keer noted that Bougalis had no manipulative, visual, or communicative limitations, but she should avoid concentrated exposure to environmental hazards, such as machinery or heights. (Tr. 191-92).

Dr. Keer gave the following explanation for her determination:

- Medical records from the Wisconsin VA Clinic from February, 2005, showed normal examination with normal range of movement of all joints, supple neck, and no somatic assessment with duck walk.

- Medical evidence from July, 2004, revealed full range of movement of both elbows, wrists, and finger joints, with no swelling, mildly elevated Phalen sign, and negative Tinel sign.

- Medical evidence from July, 2005, indicated chronic neck pain, decreased range of movement, spasms, and intact neurological status. Cervical spine x-rays were unremarkable.

(Tr. 192). Dr. Keer assigned a primary diagnosis of chronic neck pain and a secondary diagnosis of bilateral knee pain. (Id.). Dr. Keer concluded that Bougalis could do light work. (Id.).

Based on the reports of the State Agency examiners, the SSA concluded that there was no change in circumstance from the previous ALJ decision, and, therefore, Bougalis was not disabled. (Tr. 186, 192, 194-95).

On reconsideration, State Agency physician Dr. Mikhail Bargan completed a physical RFC assessment of Bougalis on March 4, 2011. (Tr. 205-07). Dr. Bargan found that Bougalis could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push or pull. (Tr. 205-06). Dr. Bargan also determined that Bougalis could frequently climb ramps or stairs, frequently kneel and crawl, and was unlimited in her ability to balance, stoop, and crouch, but could never climb ladders, ropes, or scaffolds. (Tr. 206). Dr. Bargan noted that Bougalis had no manipulative, visual, or communicative limitations, but she should avoid concentrated exposure to environmental hazards, such as machinery or heights. (Tr. 206-07).

On March 3, 2011, State Agency psychologist Tasneem Khan, Ed.D. filled out a psychiatric review technique form and a mental RFC assessment of Bougalis. (Tr. 204, 207-210).

As to the paragraph B criteria, Dr. Khan considered listing 12.04 (affective disorder) and 12.06 (anxiety-related disorders) and found that Bougalis had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no related episodes of decompensation, each of extended duration. (Tr. 204).

Dr. Khan provided the following explanation for her determination:

> [Bougalis] alleges having PTSD. This is a T2 claim w/ an AOD of 12/1/04 and DLI of [12/31/09]. She also had an ALJ decision of 11/27/07. Since that time, [Bougalis] has continued to receive [treatment] for PTSD and depression as indicated in the ALJ['s decision]. This evidence suggests that [symptoms] continue to wax and wane. Despite ongoing [symptoms], her [activities of daily living] and functioning are similar [to] those described in the ALJ['s decision]. Per notes, her [insight and judgment] are reported to be appropriate for daily living. She has also helped to care for ill parents in this period. There is no new and material evidence that would change the severity of [Bougalis's] impairments since the ALJ decision of 11/27/2007. [Bougalis] does not have a "Changed Circumstance" as defined in the Chavez Acquiescence Ruling 97-4 from the [ALJ's] decision dated November 27, 2007. The ALJ decision is therefore adopted.

(Id.).

On the mental RFC assessment, Dr. Khan determined that Bougalis was not significantly limited in her understanding and memory, except that Bougalis was moderately limited in her ability to understand and remember detailed instructions. (Tr. 208). Dr. Khan noted that the evidence suggested that Bougalis could remember basic workplace locations and procedures and could understand simple one- to two-step

instructions.  (Id.).  Dr. Khan further indicated that Bougalis was not significantly limited in the area of sustained concentration and persistence.  (Tr. 208).  Dr. Khan noted that Bougalis was moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination or proximity to others without being distracted by them, and her ability to complete a normal workday or workweek without interruptions from her psychological impairments.  (Id.).  Dr. Khan opined that Bougalis could perform at a consistent pace particularly if engaged in a simple task and could complete tasks that would not require more than daily planning or independent prioritization of tasks.  (Tr. 209).

In the area of social interaction, Dr. Khan found that Bougalis was moderately limited in her ability to interact appropriately with the general public, her ability to accept instructions and respond appropriately to criticism from supervisors, her ability to get along coworkers or peers without districting them or exhibiting behavioral extremes, and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Id.).  Dr. Khan noted that Bougalis would be best suited to a work environment with minimal social demands where interaction with others was superficial and occasional, and where she would not be expected to resolve conflicts or persuade others to follow demands.  (Id.).

With respect to adaptation limitations, Dr. Khan determined that Bougalis was moderately limited in her ability to respond appropriately to changes in the work setting, but was not significantly limited in all other areas.  (Id.).  Dr. Khan noted that Bougalis

appeared "capable of simple one and two step tasks in a routine and predictable environment where changes can be easily explained, and interaction w/ others is superficial and occasional."  (Id.).

Based on the findings of the State Agency examiners, the Commissioner concluded that there were no changed circumstances from the prior ALJ decision, and therefore Bougalis did not qualify for benefits.  (Tr. 212).

## VI.   HEARING TESTIMONY

Prior to commencement of the testimony at the hearing on November 20, 2011, Bougalis's attorney, Andrew Muirhead, made an opening statement to the ALJ:

> In the previous determination of the [ALJ], [Bougalis] was found to have . . . severe impairments including cervical kyphosis, knee pain, need for orthotics, history of migraines and a depressive disorder with anxiety and [PTSD].  The administrative decision found that with regards to the activities [of] daily living there was a moderate restriction; social interaction was moderate as well as concentration, persistence and pace.  The RFC . . . was a light RFC with the need for unskilled work with only brief superficial contact with coworkers, supervisors, incidental public contact totaling no more than one sixth of the work day and no direct customer service; no rapid or frequent change in work routine.  Because this decision became final under Chavez acquiesce rule . . . [Bougalis] would have to show that there has been a changed circumstance to her medical conditions and to the RFC.
>
> We believe that prior to the date last insured of December 31, 2009 there would be changed circumstance in the fact that there is now and had been prior to the DLI a diagnosis of intermittent hand pain. . . .  [T]here was a rheumatology consult on January 23, '09 . . . .  Diagnosis or complaints of intermittent hand pain were offered.  There were x-ray studies done and a diagnosis offered of one of [osteoarthritis].  There [were] . . . complaints of numbness in the left hand upon typing. . . .
>
> Additionally, there was during this period of time treatment for a non-cardiac chest pain.  There was echocardiogram

studies done and other stress tests done. . . . [T]he conclusion was that the chest pain was related to anxiety.

Finally, we believe that there's a changed circumstance with regards to [Bougalis's] mental impairments.   In the prior decision, the Judge commented that the GAF scores suggested a moderate limitation.   [S]ubsequent to the ALJ decision and prior to the DLI on . . . June 17, 2008 the . . . GAF score of 50 was offered . . . .   That GAF score remained subsequent to the DLI in August 19, 2010 and the update of records the most recent GAF score I saw suggested a GAF score of 40.  We believe that . . . the GAF score which is consistent with [Bougalis's] complaints of increased stress and increased memory and concentration problems would have changed her restrictions in the areas of social interaction and concentration, persistence and pace from a moderate to one of moderate to marked.  From a . . . functional point of view we would suggest that those additional limitations would impact [Bougalis's] ability to sustain work even within that RFC offered by the court and specifically I would offer that although there [are] very specific limitations in interaction, I would suggest that [Bougalis's] ability to perform work activity would be impacted throughout the day on an occasional basis.

So in conclusion, prior to the date last insured and pursuant to the <u>Chavez</u> acquiesce rule I believe that . . . there is an additional sematic complaint with the intermittent hand numbness and that there has been a changed or worsening condition to her mental health such that [Bougalis's] ability to sustain work at even a light level and even sedentary level is now compromised.

(Tr. 139-40).

Following the opening statement, Bougalis was called to testify.  Bougalis stated that she was born on May 20, 1963.  (Tr. 141).  Bougalis declared that she had not performed any paid work since November 28, 2007.  (<u>Id.</u>).

Bougalis testified that she started having problems with her hands in April of 2008.  (Tr. 151).  She indicated that her fingers would hurt and become numb three or four days a week, often for no reason, and these symptoms would last the whole day.

(Tr. 151-52).  Bougalis saw a rheumatologist in 2009 who took x-rays of her hands and feet.  (Tr. 152).  Bougalis believed she had arthritis.  (Id.).  Bougalis testified that the condition had become worse since 2008, because she now has constant pain in her fingers.  (Id.).  Bougalis noted that the pain gets worse when writing for more than three or four minutes and that her hand pain prevents her from writing and typing.  (Tr. 153, 155).

With regard to her mental health, Bougalis stated that she had been diagnosed with PTSD and depression, and she had received treatment for these conditions since 1995.  (Tr. 157).  Bougalis recalled that she had told her therapist about having increased stress in 2007, 2008 and 2009.  (Tr. 159).  Bougalis testified that, during this time, she became more depressed and did not want to be around people anymore, and she had trouble leaving the house.  (Tr. 160).  Consequently, Bougalis called her therapist on the phone instead of visiting in person.  (Id.).  Bougalis explained that she could not sleep or get out of bed, she stopped all her activities, and "gave up on life." (Tr. 161, 167-68).  Bougalis stated that she would not do chores or shop for groceries, and that she would sit on the couch all day.  (Tr. 168).

Bougalis indicated that she went to Chicago for six months to visit her aunt, who was dying.  (Tr. 168).  Bougalis reported that while she was in Chicago, she was raped, and this contributed to her increased mental symptoms.  (Tr. 169-70).

Bougalis testified that she had chest pains during this time, which were related to anxiety.  (Id.).  Bougalis stated that she experienced body pains and had no energy. (Tr. 162).  Bougalis indicated that her symptoms improved after taking prescribed medication.  (Tr. 162-63).

Towards the end of 2009, Bougalis stated that she developed additional problems with memory and concentration.  (Tr. 165-66).  Bougalis noted that the VA showed her how to record appointments on her phone, but it was ineffective, and she still has difficulties remembering things.  (Tr. 167).

In response to questioning by the ALJ, Bougalis testified that she had moved to Arizona from Minnesota and was trying to convince her mother to live with her.  (Tr. 170).  Bougalis denied having told her therapist that she was planning to go back to Minnesota on a monthly basis for therapy.  (Tr. 170-71).  Bougalis explained that she went back to Minnesota for her son's court case and because her mother was sick, and that she would not have gone to Minnesota if not for her son's case.  (Tr. 171).

The VE was called to testify next.  Bougalis's counsel asked the VE to adopt "the courts RFC and then adding just two points."  (Tr. 172).   The following exchange then took place:

> Q    Dr. Komar, if we were to assume a Residual Functional Capacity at the full range of light work with the need for additional limitations in that the individual could perform unskilled work with brief superficial contact with coworkers, supervisors, incidental public contact totaling no more than a sixth of the work day; no direct customer service and no rapid or frequent changes in work routines.  And then if we were to add -- if we were to accept [Bougalis's] testimony that additionally there would be intermittent symptoms of her hands that would impact ability to do no more than only occasional typing or writing and them finally, . . . if we were again to add to this hypothetical that the ability to do the unskilled work as we defined -- I'm not going to change any of the interactions with supervised or public but add that the person can only even at the unskilled level can only perform work . . . at an occasional basis at one time up to two hours at a time. . . . I'm trying to suggest that off task so that . . . two hours of simple, repetitive work would be okay but more than that consecutively they would have to be off task for a period of time.

A       For how long?

Q       Well, let me start off by saying less than 15 percent of the work day.  I know that's kind of the benchmark. . . . [S]o if we go back to the intermittent problems with the hands, does that in any way impact the ability to -- well, let me ask this.  I'm sorry.  I'm sorry, Your Honor.  Number one is with the -- forget about the additional problems with memory and concentration.  If we just -- I'll give you the RFC and then I added the occasional limitations in typing and writing.

A       We're covering a lot of ground, Mr. Muirhead.

(Tr. 172-73).

Following this exchange, the ALJ also showed a copy of the prior RFC to the VE.

(Tr. 174-75).

Bougalis's attorney stated that he intended the VE to assume the RFC from the prior ALJ, with additional limitations in the hypothetical individual's ability to type and write, (Tr. 173), and later with the additional limitation on concentration that the person would be off task more than 15 percent in a workday.  (Tr. 177).  Specifically, counsel asked the VE to assume a light RFC at the unskilled range of work, with the added limitations on the use of the hand to only occasional typing or writing throughout an eight-hour day.  (Tr. 175).  The VE opined that the hypothetical individual could not perform any of the range of light or sedentary work.  (Tr. 175-76).  Counsel then asked the VE to assume the prior RFC and ability to do unskilled work and to disregard the limitations of the hands, but to add the limitation that the hypothetical individual would be off task more than 15 percent of the workday because of impairments in memory and concentration.  (Tr. 176-77).  The VE testified that the individual could not perform any work at any level, including sedentary or light work.  (Tr. 177-78).

The ALJ asked the VE to assume a hypothetical person with the same age, education, and work history as in the prior RFC, who had the ability to frequently handle and finger one-third to two-thirds of the work day.  (Tr. 179).  The VE indicated that the hypothetical person could work as a housekeeping cleaner, courier, or small products assembler and stated there were 26,500 housekeeping cleaner jobs in Arizona; 1500 courier jobs in Arizona; and 17,500 small products assemblers in Arizona.  (Id.).  The VE clarified that, if handling and fingering ability were reduced to occasional, all work would be eliminated.  (Id.).

## VII.  DISCUSSION

### A.  Application of the Chavez Presumption

In determining that Bougalis was not disabled, the ALJ applied the Chavez presumption of nondisability.  (Tr. 125).  In Chavez, the Ninth Circuit held:

> The principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings.  The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove "changed circumstances" indicating a greater disability.

844 F.2d at 693 (citations omitted).

In response to this decision, the SSA issued AR 97-4(9), which provided that Chavez differs from SSA policy as follows:

> Under SSA policy, if a determination or decision on a disability claim has become final, the Agency may apply administrative res judicata with respect to a subsequent disability claim under the same title of the Act if the same parties, facts and issues are involved in both the prior and subsequent claims.  However, if the subsequent claim involves deciding whether the claimant is disabled during a period that was not adjudicated in the final determination or decision on the prior claim, SSA considers the issue of

disability with respect to the unadjudicated period to be a new issue that prevents the application of administrative res judicata. Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period. SSA does not adopt findings from the final determination or decision on the prior disability claim in determining whether the claimant is disabled with respect to the unadjudicated period. Further, under SSA policy, a prior final determination or decision that a claimant is not disabled does not give rise to any presumption of a continuing condition of nondisability. When a subsequent claim involves an unadjudicated period, the determination or decision as to whether a claimant is disabled with respect to that period is made on a neutral basis, without any inference or presumption that a claimant remains "not disabled."

The United States Court of Appeals for the Ninth Circuit held that a final decision by an ALJ that a claimant is not disabled gives rise to a presumption that the claimant continues to be not disabled after the period adjudicated, and that this presumption of continuing nondisability applies when adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim. In order to rebut the presumption of continuing nondisability, a claimant must prove "'changed circumstances' indicating a greater disability." In addition, the court indicated that where the claimant rebuts the presumption by proving a "changed circumstance," principles of res judicata require that certain findings contained in the final decision by the ALJ on the prior claim be given some res judicata consideration in determining whether the claimant is disabled with respect to the unadjudicated period involved in the subsequent claim. The court concluded that where the final decision by the ALJ on the prior claim, which found the claimant not disabled, contained findings of the claimant's residual functional capacity, education, and work experience, SSA may not make different findings in adjudicating the subsequent disability claim unless there is new and material evidence relating to the claimant's residual functional capacity, education or work experience.

AR 97-4(9) (emphasis added).

The SSA declared that it would apply the Chavez presumption "only to disability cases involving claimants who reside in Alaska, Arizona, California, Guam, Hawaii, Idaho, Montana, Nevada, Northern Mariana Islands, Oregon or Washington at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level." Id.

In support of her motion for summary judgment, Bougalis argued that the ALJ erred in applying Chavez and AR 97-4(9)[30] because the record contained insufficient evidence to establish that she resided in Arizona at the time of the hearing.  Pl's Mem., pp. 28-29.  Therefore, Bougalis contended, the case should be remanded to the ALJ to make additional findings on the issue of her residency.   The Court rejects this contention, finding that the record unequivocally establishes that Bougalis was a resident of Arizona at the time of the hearing.

For starters, in her application for disability benefits dated November 18, 2010, Bougalis listed her address as XXXX W. Louise Drive, Sun City, Arizona.  (Tr. 311). That same Arizona address appeared on Bougalis's request for review by the Appeals Council in May of 2012.  (Tr. 339).  At the hearing, which took place in Phoenix, Arizona, Bougalis testified that she had moved to Arizona from Minnesota and was trying to convince her mother to move in with her.  (Tr. 170).

Additionally, in January, 2011, Bougalis's son stated that "family problems drove [Bougalis] to leave Minnesota and start over in Arizona.  She chose Arizona to be close to veterans [sic] medical facilities so she could receive mental health care on a regular basis, something that was impossible for her in Minnesota . . . ."  (Tr. 331).  In June of

---

[30]   The Court refers to Chavez and AR 97-4(9) interchangeably for purposes of this motion.

2011, progress notes from her therapist, Merrill, indicated that Bougalis "is back up here [in Minnesota] because her son is having a trial; . . . However, the trial keeps getting postponed.  She came back up her because of that, and it got postponed again." (Tr. 1225).

Notwithstanding this evidence, Bougalis noted that when she was examined by Patricia Michaels, CNS, on September 21, 2011, Michaels wrote: "'Vet lives in Hibbing, MN . . . .'"  Pl.'s Reply, p. 1 (citing Tr. 1223).  Bougalis also indicated that in June of 2011, Merrill noted that "'[Bougalis's] mother now has Alzheimer's, so she perceives herself coming back to this area quite frequently and would like to transfer her care back to the Twin Ports.'"  Id. (citing Tr. 1225).  However, the record shows that Bougalis merely "spends part of the year up on the Iron Range in Hibbing where her mother still resides."  (Tr. 1225).  In fact, Bougalis admitted at the hearing before the ALJ that she only went back to Minnesota because of her son's court case, and to care for her ailing mother.  (Tr. 171).  Bougalis testified that she "wouldn't have gone if it wasn't for the court case."  (Id.).

Finally, at the hearing and on appeal, Bougalis explicitly argued that while the ALJ's determination of her RFC in connection with her first application of benefits was final under the Chavez rule, there had been a changed circumstance with regard to hand pain and numbness, non-cardiac chest pain, and mental impairments.  (Tr, 138-140, 340-43).  Moreover, at no time during or after the hearing did Bougalis contend that the Chavez rule did not apply to her because she did not reside in Arizona.   Indeed, when the VE testified regarding the number of jobs available in Arizona for a claimant

with the RFC assigned by the ALJ, Bougalis never objected to the testimony and never claimed that Arizona job numbers had no relevancy to the step five determination.

For all of these reasons, the Court concludes that Bougalis was a resident of Arizona at the time of the hearing, and, therefore, the ALJ correctly determined that <u>Chavez</u> applies.

### B.   <u>Analysis of Bougalis's Claims under the Chavez Presumption</u>

Bougalis argued that even if <u>Chavez</u> is applicable to this case, the Court cannot determine whether the ALJ properly applied it because the prior ALJ's decision and analysis are missing from the record.  Pl.'s Mem., p. 29; Pl.'s Reply, p. 2.  The Court agrees.

As the <u>Chavez</u> presumption dictates, to rebut the presumption of continuing nondisability, a claimant must prove "'changed circumstances' indicating a greater disability."  AR 97-04(9).  Further, "where the final decision by the ALJ on the prior claim, which found the claimant not disabled, contained findings of the claimant's residual functional capacity, . . . [the] SSA may not make different findings in adjudicating the subsequent disability claim unless there is new and material evidence relating to the claimant's residual functional capacity . . . . " <u>Id.</u>

Here, despite the fact that the record supplied by the Commissioner contains the RFC from the previous decision, and a wealth of records dating all the way back to 1994, including records that were submitted in 2005, unfortunately the prior ALJ's decision is not part of this record.  This is fatal to this Court's ability to conduct the appropriate review to determine whether the ALJ's decision to apply the <u>Chavez</u> presumption is supported by the record as a whole.  In short, because the prior ALJ's

decision is missing from the record, the Court is unable to determine what severe impairments the prior ALJ found, or what evidence he considered in connection with the previous RFC assessment and his ultimate determination that Bougalis was not disabled.  Lacking this critical information, the Court has no ability to determine whether the ALJ's conclusion that there was not a change in circumstances indicating a greater disability was or was not supported by the record as a whole.

In making this determination, the Court rejects the Commissioner's suggestion that the ALJ did not actually apply the <u>Chavez</u> presumption but rather based her decision on the record as a whole.  <u>See</u> Def.'s Mem., pp. 8-9.  Contrary to the Commissioner's argument, it is clear that the ALJ applied the <u>Chavez</u> presumption.  In her decision, the ALJ expressly stated:

> [A]s discussed in greater depth below, the *Chavez* decision requires the presence of "changed circumstances' indicating a greater disability" and mandates that the undersigned apply a presumption of continuing non-disability and determine that the claimant is not disabled with respect to that period, unless the claimant rebuts that presumption. . . . In this case the claimant has not rebutted the presumption and must be found "not disabled" under AR 97-4(9) for the time period of November 28, 2007 through [December 31, 2009], the date last insured.

(Tr. 120).  Given the ALJ's unequivocal statement that the <u>Chavez</u> presumption applied, the Court cannot uphold the ALJ's decision on the basis proposed by the Commissioner.

> It is a well-settled principle of administrative law that a reviewing court may not uphold an agency decision based on reasons not articulated by the agency itself in its decision. In other words, a reviewing court cannot search the record to find other grounds to support the decision.  A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must reverse and remand for the agency to consider whether to pursue a

> new rationale for its decision or perhaps to change its
> decision.

<u>Mayo v. Schiltgen</u>, 921 F.2d 177, 179 (8th Cir. 1990) (footnote omitted) (internal

citations omitted).

Because the Court cannot conduct a proper review of the ALJ's application of

<u>Chavez</u>, the Court has no choice but to recommend that this case be remanded so that

the Commissioner can conduct a <u>de novo</u> review of Bougalis's claims.  In conducting its

<u>de novo</u> review, it is incumbent upon the Commissioner to address the following

records:

First, the Commissioner must consider the VA's determination of July 2, 2004,

that Bougalis was 100% disabled as a result of PTSD with prominent depressive

features.  (Tr. 350-55).  As Bougalis pointed out, the VA's determination was not

addressed or even mentioned by the ALJ.  While it is true that a disability determination

by a federal government agency is not binding on the Commissioner, it is entitled to

some weight and must be considered.  <u>See</u> <u>Morrison v. Apfel</u>, 146 F.3d 625, 628 (8th

Cir. 1998) (citations omitted); <u>Peterson v. Astrue</u>, Civ. No. 07-4068 (ADM/RLE), 2008

WL 4323717, at *21 n. 7 (D. Minn. Sept. 18, 2008).  As such, upon remand, the ALJ

must consider the VA's determination and explain the weight given to it.[31]

---

[31]   The Court cannot say that the failure to address the VA's decision was harmless merely because other evidence in the record supports the ALJ's RFC assessment. Because the prior ALJ's decision is missing from the record, it is not known whether the VA's determination was considered in connection with Bougalis's first application for disability benefits.  Without this information, the ALJ could not have properly determined whether Bougalis's PTSD symptoms worsened since the previous application.  <u>See</u> AR 97-4(9) ("Adjudicators must adopt . . . finding[s] from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period <u>unless there is new and material evidence relating to such a finding</u> . . . .") (emphasis added).

Second, the Commissioner must address the opinions of the State Agency consultants. (See Tr. 182-212). Social Security Ruling 96-9p provides, in relevant part:

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

SSR 96-6P, 1996 WL 374180, at *2 (Social Security Administration July 2, 1996) (emphasis added).

In this case, the ALJ stated only that "[t]reating, examining, and consultative medical source opinions also support the limitations in the above assessment." (Tr. 128). Assuming, for argument's sake, that this statement was made in reference to the State Agency consultants' opinions, it certainly does not "explain the weight" the ALJ assigned to them. Accordingly, on remand, the ALJ must specifically state what weight was afforded to the State Agency consultants' opinions and why such weight was given.

Third, the Commissioner must consider whether Bougalis's diagnosis of fibromyalgia exacerbated Bougalis's physical symptoms and perception of pain. Although Bougalis was not diagnosed with fibromyalgia until April 5, 2011, (Tr. 967-68, 1155), more than a year after the date last insured, the diagnosis could help to explain the symptoms Bougalis had experienced before the date last insured. See Wilson v.

---

In any event, '[i]f the ALJ was going to reject the VA's finding, reasons should have been given, to enable a reasoned review by the courts." Morrison, 146 F.3d at 628.

Sullivan, 886 F.2d 172, 177 (8th Cir. 1989) ("'[M]edical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.'") (quoting Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984)); Wallace v. Astrue, Civ. No. 10-342 (JRT/FLN), 2011 WL 1990147, at *15 (D. Minn. Feb. 25, 2011), report and recommendation adopted, 2011 WL 2014884 (D. Minn. May 23, 2011) (same).

Likewise, the Commissioner must examine and evaluate those records generated after the last date of insured to the extent that they bear on the impairments Bougalis has alleged between November 27, 2007 through December 31, 2009.  While it is true that medical evidence concerning a claimant's condition after the date last insured may not always be probative of her condition during the relevant period, (see Davidson v. Astrue, 510 F.3d 987, 990 (8th Cir. 2007); Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000)), it is the Commissioner who must make an initial determination on that issue, based upon the record as a whole.

Lastly, the Commissioner must address the Mental Impairment Questionnaire completed by Macaulay on June 21, 2007.  (Tr. 284-89).  The ALJ made no mention of this Questionnaire in her decision.    Instead, the ALJ limited her discussion to Macaulay's November 18, 2011 letter.  (Tr. 128).  Although the Questionnaire was completed months prior to Bougalis's alleged disability onset date, it may be probative of Bougalis's status during the relevant period.  Cf. Wilson, 886 F.2d at 177.  Further, because the prior ALJ's decision is not in the record, it is not known whether Macaulay's Questionnaire was considered in connection with Bougalis's prior application for

disability benefits.   As such, the Questionnaire may constitute new and material evidence that supports an RFC different from that found by the prior ALJ.   See AR 97-4(9).[32]

## VII.   CONCLUSION

The ALJ found that Bougalis was not disabled because she had not rebutted the Chavez presumption of continuing nondisability arising from her previous application for Social Security benefits.   Although the Chavez presumption clearly applies, the Court cannot determine whether the ALJ correctly found that Bougalis had not rebutted the presumption because the prior ALJ's decision is missing from the record.   Accordingly, this case must be remanded so that the Commissioner can consider Bougalis's claims based on all the evidence in the record.   Upon remand, the Commissioner must discuss the 100% disability determination made by the VA, the opinions of the State Agency consultants, the diagnosis of fibromyalgia, medical records generated after the last date of insured and the Mental Impairment Questionnaire completed by Macaulay in June, 2007.

## VIII.   RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

---

[32]   In addition, the Court notes that the Questionnaire may help to explain the sporadic nature of Macaulay's treatment of Bougalis.   In the Questionnaire, Macaulay explained that "[t]he distance from the Vet Center, [Bougalis's] limited finances for travel, and her extreme social anxiety makes sessions difficult."   Further, following the ALJ's rejection of Bougalis's application for disability benefits, Macaulay wrote that the ALJ had misinterpreted her statements regarding the sporadic nature of her treatment. (Tr. 1244).   Macaulay explained that therapy sessions were infrequent because Bougalis was "so impaired she could not even come in to a relatively safe place to talk and receive support."   (Id.).

1.      Plaintiff's Motion for Summary Judgment [Docket No. 12] be **GRANTED** in part and **DENIED** in part; and this matter remanded for further proceedings consistent with this Report and Recommendation;

2.      Defendant's Motion for Summary Judgment [Docket No. 16] be **DENIED**.


Dated:        June 4, 2015

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 18, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.